251 So.2d 592

**James WASHINGTON**

**v.**

**STATE of Alabama.**

**4 Div. 334.**

Supreme Court of Alabama.

Aug. 5, 1971.

Rehearing Denied Sept. 2, 1971.

Smith & Smith, Dothan, for appellant.

MacDonald Gallion, Atty. Gen., and W. Mark Anderson, III, Special Asst. Atty. Gen., for the State.

LAWSON, Justice.

James Washington was convicted in the Circuit Court of Houston County of the first degree murder of Benjamin O. Sailors, a police officer of the City of Dothan. The jury fixed his punishment at death. Judgment and sentence were in accord with the verdict.

Our review is controlled by the automatic appeal law. applicable to cases where the death sentence is imposed.—Act 249, approved June 24, 1943, General Acts 1943, p. 217, carried in the 1955 Cumulative Pocket Part to Volume Four, 1940 Official Code, and in the 1958 Recompiled Code (unofficial) as Title 15, §§ 382(1) et seq.

Sailors was shot to death on the morning of August 19, 1967, apparently by a person whom he surprised while engaged in the act of removing copper wire from a storage place of the City of Dothan.

The police ascertained within a short time after his death that Sailors had been killed by a .22 long rifle bullet fired from a .22 caliber pistol. Many persons were questioned and many pistols were tested, but the investigating officers obtained no evidence which tended to point to any person as being the killer of Sailors prior to the time Washington came into the picture in December of 1967.

On the night of December 10, 1967, Lamar Hadden, an agent of the Alabama Alcoholic Beverage Control Board, saw a man, whom he later identified as Washington, driving a 1960 De Soto automobile at a point in the vicinity of the storage place where Sailors' body had been found.

The rear end of the automobile appeared to Hadden to be heavily laden, so he followed the De Soto for several blocks before Washington drove it into a dead-end street, where Hadden shot at the tires on the De Soto. Washington, according to Hadden, "shot back four or five times with a small caliber pistol, after ramming my car." After "ramming" his automobile into the side of Hadden's automobile, Washington drove his automobile off the traveled part of the street and thereby eluded Hadden.

Hadden, in reporting the incident to the police, gave them a description of the automobile, as well as the number of the license tag which was on it. It was a Georgia license tag.

A warrant for Washington's arrest for the offense of assault with intent to murder Lamar Hadden was obtained on the night of the incident referred to above, that is, on the night of December 10, 1967.

The Dothan police immediately notified law enforcement officials of Georgia of the Hadden incident and gave them a description of Washington's automobile and the number of its license tag.

At about ten o'clock that night, December 10, 1967, a Georgia State Trooper or Highway Patrolman located Washington's automobile on U. S. Highway 84 at a point approximately two miles east of Donaldsville, Seminole County, Georgia. At the time the officer reached the automobile no one was in it.

The automobile was returned to Dothan that night and was placed in the "pound" of the City of Dothan.

Washington was in Tallahassee, Florida, on Monday morning, December 11, 1967, from which place he apparently made a telephone call to his wife, who was in their home town, Cairo, Grady County, Georgia. In that telephone conversation or in some other way Washington learned that he was being sought by Sheriff Jimmy Hicks of Grady County, Georgia, and Sheriff Dan White, of Seminole County, Georgia.

After getting that information, Washington called Sheriff Hicks and in the telephone conversation it was agreed that the

Sheriff would drive to Tallahassee to transport Washington to Cairo. Sheriff Hicks drove to Tallahassee and located Washington without any difficulty. Sheriff Hicks and Washington drove back to Cairo, arriving there at approximately one o'clock on the afternoon of December 11, 1967. Washington was not under arrest. He accompanied the Sheriff voluntarily but was detained in and around the Sheriff's office for a short time awaiting the arrival of police officers of the City of Dothan.

Police officers of the City of Dothan, including Lt. Deal and Detective Dillard, carried with them to Cairo the warrant which had been issued the previous night which charged Washington with the offense of assault with intent to murder Lamar Hadden. Lt. Deal placed Washington under arrest for the offense charged in the warrant and told him "that he had a right to remain silent, and that anything he said could be used against him in Court, and that he had a right to consult with an attorney and have him present during questioning, and that if he couldn't afford an attorney, hire an attorney, one would be appointed for him; and if he answered any questions at that time that he could stop at any time until he could employ an attorney." The language just quoted is substantially that which the Supreme Court of the United States has said must be given by law enforcement officers before questioning a person who has been taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694. That admonition is frequently referred to as the Miranda warning and we will hereinafter so refer to it.

Washington was not questioned while in Cairo, although when confronted with the warrant for his arrest he said in effect that he did not know what it was all about.

Washington had signed a waiver of extradition before the Dothan officers arrived in Cairo and shortly after his arrest he was returned to Dothan and placed in the jail of that city in the early part of the night of Monday, December 11, 1967.

After he was placed in jail on Monday night, December 11th, Washington was asked if he wanted an attorney or "a chance to call an attorney," to which question he replied "that his wife or some of his relations would obtain an attorney for him." He was not questioned further on that night.

On Monday morning, December 11, 1967, or on Tuesday morning, December 12th, at about 8:30, Sheriff A. B. Clark of Houston County, Alabama, acting under the authority of a search warrant, searched Washington's automobile and found in the trunk nineteen rolls of wire which weighed 760 pounds. There are tendencies in the evidence to the effect that the wire found in the automobile trunk was similar to wire owned by the City of Dothan which was missing from the storage facility on the day after the Hadden incident, Monday, December 11, 1967. The evidence supports a reasonable inference that at this point the investigating officers became aware of the possibility that Washington might have been connected with the killing of Sailors.

Thereafter, while confined to the Dothan jail on the charge of assault with intent to murder, Washington was arrested on warrants charging him with grand larceny of the wire and with leaving the scene of an accident.

Washington was questioned by Deal and Dillard on Tuesday, December 12th; Wednesday, December 13th; and Friday, December 15, 1967. The record tends to show that he was not questioned on Thursday, December 14, 1967, the day on which he was driven to Montgomery for a polygraph test which did not materialize.

Dillard and Deal were examined out of the presence of the jury (Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593; Duncan v. State, 278 Ala. 145, 176 So.2d 840) in regard to their ques-

tioning of Washington. We will summarize their testimony taken in that manner.

On Tuesday, December 12, 1967, Dillard and Deal gave to Washington the so-called Miranda warnings and then questioned him for an hour or two about the assault with intent to murder charge then pending against him. At the outset of the questioning Washington denied being in Dothan on the night of December 10, 1967, when the assault with intent to murder Lamar Hadden was alleged to have occurred. Later he admitted that he had been in Dothan on that night and also admitted that he had been involved in an incident with Hadden when he fired a .32 caliber pistol which he threw out of his automobile somewhere between Dothan and Columbia as he drove away from Dothan. In the course of the questioning the interrogating officers questioned Washington considerably about the pistol. Washington inquired, in effect, as to how it would help him to tell them the location of the pistol. His question was not answered. The officers simply told him that they needed the pistol as a part of their investigation of the assault with intent to murder charge.

Dillard and Deal next questioned Washington on Wednesday morning, December 13, 1967, for a period of time not exceeding two hours. He was again given the Miranda warnings, including his right to have an attorney present during the questioning. When told that he could call an attorney by telephone, Washington replied that he did not wish to make such a call, "that his wife, his people, would employ an attorney for him." Washington was told that his wife would be permitted to visit him in jail. When his wife did come to visit him Washington told her "to tell his sister to employ an attorney for him." Despite that interest in obtaining an attorney employed by members of his family, Washington never indicated in any way that he objected to being questioned in the absence of an attorney who represented him. The questioning on Wednesday morning related to the pistol which Washington had fired during the

Hadden incident on the night of December 10, 1967. In this connection Deal testified: "Well, during this questioning, he stated that he was afraid that if he turned the gun over to us that it would bring on more trouble. And we—myself or Dillard one asked him what kind of trouble and he said he didn't know." In regard to Wednesday afternoon, Deal testified: "We took him and went out on the Webb road between Dothan and Columbia at a spot that he indicated that he had thrown this pistol out. We did go out there and look for the pistol, a search of that area, but we were unable to find it. We didn't find anything."

Dillard testified that the questioning of Washington on Thursday, December 14, 1967, did not last over an hour and we do not find anything in the record to indicate that he was actually questioned on that date. It does appear from the record that while in the office where the polygraph test was to be administered, Washington was again given the Miranda warnings. It does not appear that he was questioned in any way by Dillard or Deal on that occasion, but the record does show that on the way back to Dothan from Montgomery, Washington, without being questioned, asked "how him telling us where the pistol was—to locate the pistol, how it would help him." In response to that question Deal testified: "We told him we needed the gun as part of the investigation. We didn't know how it could help him, but the gun was needed as part of the investigation."

Dillard and Deal, before talking with Washington on Friday morning, December 15th, had been told by Lamar Hadden, in effect, that he would be willing for the charges of assault with intent to murder and leaving the scene of an accident to be dropped if Washington would reveal the location of the pistol which he had used in the Hadden incident. The District Attorney had advised those officers that he would comply with Hadden's wishes and would agree to a reduction in the amount of the bond in the grand larceny case if Washington would produce the pistol.

The interrogation of Washington on Friday, December 15th, took place not only in the presence of Dillard and Deal, but of Hadden and the District Attorney, but neither Hadden nor the District Attorney gave evidence as to the details of the questioning.

Washington was again given the so-called Miranda warnings. He stated that he did not want to talk to an attorney, saying that "his people would take care of an attorney—to employ an attorney for him."

According to Deal, before anyone offered Washington any reward or held out any inducement to get him to reveal the location of the pistol, Washington, on the morning of Friday, December 15th, made a statement that "he desired to make bond and that he wanted to be with his wife during Christmas, that she was pregnant at that time, was expecting about that time. That he desired to make bond. * * * He wanted to have the bond lowered. He desired to have the bond lowered so that he could make bond." The bond to which Washington made reference was that set in the grand larceny case. It was apparently in a much larger amount than the amount of the bonds fixed in the other two cases.

Deal thereupon promised Washington that the charges against him, other than for grand larceny, would be dismissed, and the bond in that case lowered to such an amount that he could make bond, if he would produce the pistol which he had fired in the Hadden incident.

According to Dillard, Washington said "one time he had made up his mind that no one would ever get the gun and that he wanted it destroyed and *we told him that it would be destroyed*." (Emphasis supplied) Dillard also testified that Washington wanted to know "how we could tell if that gun was used in any other crime." In reply Dillard said to Washington: "I told him I didn't know. We would have to get the weapon first before we could tell."

Washington then told his interrogators that the pistol was in Tallahassee, Florida;

that he had wiped it clean and wrapped it in a sack or cloth and hidden it near some railroad tracks. Washington also told them that he had obtained the pistol at Jerry's Truck Stop outside of Cairo, Georgia.

After making those statements, Washington agreed to accompany the interrogators, or some of them, to Tallahassee and to point out to them the place where he had hidden the pistol. He did accompany some of the officers to Tallahassee where Deal, following Washington's directions, recovered the pistol, a .22 caliber Rohm blue revolver.

Deal admitted that he told Washington that the reason he needed to get the pistol was to aid in the investigation of the assault with intent to murder and leaving the scene of an accident charges, while at the same time he was telling Washington that those charges would be dismissed if he would produce the pistol.

The interrogating officers did not tell Washington that their reason for wanting to get possession of the pistol was to determine if it was used in the killing of Sailors. In fact, the death of Sailors was never mentioned during the course of the investigation.

At the conclusion of the examination of Dillard and Deal which took place out of the presence of the jury, the trial court made the following statement:

"* * * the Court is going to limit the statements made by the defendant to the officers to the time of when it was established that a promise was made to the defendant. I am going to allow the statements made up until that point. The Court will allow testimony as to the pistol being found and the statements made by the defendant in regard to that pistol. I will not—the Court will not allow any statements made by the defendant subsequent to the time of the making of any promise to the defendant other than his taking the officers to the place where the pistol was and where it was found. * * *"

Detective Dillard gave no material testimony in the presence of the jury relative to the questioning of Washington.

Lt. Deal did testify before the jury as a witness for the State. As here material, his testimony so given was substantially as follows:

He first saw Washington in the Sheriff's office in Cairo, Georgia, on December 11, 1967. He told Washington that he had a warrant charging him with "assault to murder" and thereupon arrested Washington. He gave Washington the Miranda warnings. Washington made no statement at that time. Deal and his fellow officers brought Washington to Dothan on that day and placed him in the City jail.

Deal next saw Washington at about 10:00 a. m. on Tuesday, December 12th. The Miranda warnings were given again to Washington before questioning him. No one in Deal's presence promised Washington anything, offered him any inducement or reward or threatened him in any way in order to get him to make a statement.

Washington stated that he used a .32 caliber pistol during the Hadden incident. Upon being questioned about the location of the pistol, Washington asked "how it would help him if he told us where the pistol was." In reply Washington was told "we needed it as part of the investigation. We advised him we needed it for the investigation of the assault to murder charge."

Washington then made the statement "that he threw the pistol out between Dothan and Columbia. The route that he had taken after this incident on Sunday night."

Deal next saw Washington on Wednesday morning, December 13th. Before Deal and Dillard questioned Washington he was given the Miranda warnings. Washington was not threatened in order to get him to make a statement, nor for that purpose was he offered any reward or inducement.

According to Deal: "The subject stated to us that he was afraid that if he turned the gun over to us that it would bring on more trouble for him. And I asked him what kind of trouble, and he said he didn't know."

Deal also testified: "Afterwards on Wednesday, we went out and looked for the pistol on the Webb road between Dothan and Columbia. That is where he said he threw it out at. The location." The pistol was not found.

He saw Washington on Thursday afternoon, December 14th, at the Police Department where he had a conversation with him concerning the polygraph test.

Deal, Dillard and Hadden had a conversation with Washington at about 8:00 or 9:00 a. m. on Friday, December 15, 1967, after he was given the Miranda warnings. He was not threatened nor was any promise made to him or any reward offered or any inducement extended to get him to make a statement.

According to Deal, Washington opened the conversation with the statement "that he wanted to be with his wife at Christmas. She was expecting a child and—around Christmas and he would like to make bond. Wanted to make bond. Wanted his bond lowered."

After that statement Deal made a promise to Washington, saying "that if he would take us where the pistol was—produce the pistol, that the charges of assault to murder and leaving the scene of an accident against him—Lamar Hadden had agreed to drop the charges and his bond would be lowered. The grand larceny bond would be lowered."

Thereupon, according to Deal, "The defendant [Washington] agreed to go with myself and Detective Dillard and Lamar Hadden to Tallahassee, Florida, to recover the pistol." They went to Tallahassee to a weeded area near railroad tracks where Washington pointed to a spot. Deal went to that spot where he found a .22 caliber

Rohm brand blue revolver in a paper sack wrapped in bread paper.

Deal was shown a revolver which he identified as the one which he recovered in Florida. The revolver was later introduced in evidence.

The revolver was loaded with .22 caliber long rifle bullets when Deal recovered it in Tallahassee.

Deal and Dillard carried the revolver to the Crime Laboratory in Auburn, where it was turned over to Guy Parnell, a toxicologist.

Mr. Parnell, the toxicologist who had removed the lethal bullet from the body of Sailors, determined that that bullet was fired from the pistol which was delivered to him by Deal and Dillard on the night of December 15, 1967.

The charges of assault with intent to murder and leaving the scene of an accident were nol prossed on Monday, December 18, 1967, according to the recollection of the District Attorney, who was called as a witness by the defendant. The record does not disclose that the amount of the bond in the grand larceny case was reduced as promised. Apparently Washington was not released on bail after he was returned to Dothan from Tallahassee, Florida.

As a result of the ballistics tests made by Mr. Parnell, the defendant, Washington, was arrested on December 19, 1967, on a warrant charging him with the offense of first degree murder. On March 15, 1968, he was indicted by a grand jury of Houston County for the first degree murder of Benjamin O. Sailors.

Jerry Buffington, a witness for the State, testified that on April 11, 1967, he sold to the defendant, Washington, the pistol which was "recovered" in Tallahassee. Buffington lived in Donaldsonville, Georgia, and helped his father operate Jerry's Truck Stop.

Washington testified on his own behalf, although his court-appointed counsel "strongly advised" him not to take the stand.

Washington denied that he killed Sailors, saying that he was not in Dothan on the day that Sailors was killed.

Washington admitted being in Dothan on the night of December 10, 1967, saying that he had been sent to the aforementioned storage place by one Wesley to pick up some copper wire. He had never been there before, but located it by following directions given him by Wesley. After he loaded the wire into the trunk of his automobile he encountered Lamar Hadden and while trying to make his escape from Hadden he fired his "gun" into the air three times. The "gun" which he fired on that occasion had been purchased from Buffington and was the pistol which had been identified as having fired the bullet which killed Sailors. Washington testified, however, that the pistol was not in his possession on the day that Sailors was killed, but he did not state where the pistol was at that time.

Washington testified that from the time of his arrest the law enforcement officers were concerned primarily with determining the location of the pistol which he had fired in the Hadden incident. During the questioning on the morning of Friday, December 15, 1967, he refused to "turn up" the pistol on the promise that the charges of assault with intent to murder and leaving the scene of an accident would be dropped. In addition, he wanted what he termed a reasonable bond set in the grand larceny case. It was only after the District Attorney assured him that "once he got over there and he got the gun that it wouldn't take no more than an hour and they would call back; and that the charges would be dropped and I could make bond at $750.00." According to Washington, on that Friday morning after he was told that the other charges would be dropped and the amount of the bond in the grand larceny case would be reduced, he agreed to "turn up the pistol provided it wouldn't cause me any trouble."

Washington further testified that "they tell me it is not going to cause you no trouble." "There ain't no way in the world for it to hurt you." " * * * we are trying to help you to be with your pregnant wife during this childbirth. You don't want to cooperate—in fact, you just don't want to help yourself."

Washington's testimony was not controverted on rebuttal.

There can be no doubt that the pistol which Washington made available to the prosecution, the evidence of the toxicologist based on an examination of that pistol, and the evidence going to show that Washington had purchased the pistol were strongly incriminating.

Likewise, it is crystal clear that such evidence was obtained as a result of promises made to Washington by law-enforcement officers.

In this state, the rule is that an inculpatory admission in the nature of a confession, that is, directly relating to the fact or circumstances of the crime, and connecting the defendant therewith, are subjected to the same rules of admissibility as direct confessions, and are therefore prima facie involuntary and inadmissible. McGehee v. State, 171 Ala. 19, 55 So. 159; Reeves v. State, 260 Ala. 66, 68 So.2d 14; Herring v. State, 242 Ala. 85, 5 So.2d 104.

In Malloy v. Hogan (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, the Supreme Court of the United States held that the Fourteenth Amendment to the Constitution of the United States prohibits state infringement of the privilege against self-incrimination, just as the Fifth Amendment to that Constitution prevents the federal government from denying the privilege, and further held:

" * * * It would be incongruous to have different standards to determine the validity of a claim of privilege based on the same feared prosecution, depending on whether the claim was asserted in a state or federal court. Therefore, the same standards must determine whether an accused's silence in either a federal or state proceeding is justified." (378 U.S., 11, 84 S.Ct., 1495, 12 L.Ed.2d, 661)

In Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, cited and quoted from in Malloy v. Hogan, *supra*, it is said:

" * * * in criminal trials, in the courts of the United States, whenever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the fifth amendment to the constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' * * *" (168 U.S., 542, 18 S.Ct., 187)

In Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311, the Supreme Court of the United States reversed Orozco's conviction of murder without malice because the Miranda warnings were not given to him before officers questioned him as to whether he had been to a restaurant on the night that a person was shot to death in front of the restaurant. When he answered in the affirmative, Orozco was asked if he owned a pistol. He admitted owning one. After being asked a second time where the pistol was located, he admitted it was in a washing machine in a back room of the boarding house. Ballistics tests indicated that the gun found in the washing machine was the gun that fired the fatal shot. The Supreme Court of the United States held "that the use of these admissions obtained in the absence of the required warnings was a flat violation of the Self-Incrimination Clause of the Fifth Amendment as construed in Miranda." (394 U.S., 326, 89 S.Ct., 1096)

The statements made by Washington to the effect that the pistol which he fired in the Hadden incident was hidden in

Tallahassee, Florida, at a specific place which he described, constituted incriminating admissions subject to the protection of the Self-Incrimination Clause of the Fifth Amendment to the Constitution of the United States. Orozco v. Texas, *supra*. Those incriminating admissions were not made voluntarily in that they were induced by promises and hope of reward in respect to the crimes for which Washington had been arrested and hence would not have been admissible as evidence against him in a trial for any of those crimes. Bonner v. State, 55 Ala. 242; Harris v. State, 280 Ala. 468, 195 So.2d 521; Womack v. State, 281 Ala. 499, 205 So.2d 579.

The admission in evidence of such statements in this case would have constituted reversible error. A reading of the record compels the conclusion that from the moment the investigating officers determined that copper wire was stored in Washington's automobile, their interrogation was directed toward the Sailors murder case and not toward the crimes with which Washington was charged. It matters not that the killing of Sailors was never mentioned during the questioning or that Washington was being held on other charges. Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381; Seagroves v. State, 282 Ala. 354, 211 So. 2d 486.

But the trial court did not permit the State to introduce in evidence before the jury the actual statements which Washington made and which led to the discovery of the pistol.

The trial court did, however, permit Deal, in the presence of the jury, to testify that after the promises were made to Washington that he "agreed to go with myself and Detective Dillard and Lamar Hadden to Tallahassee, Florida, to recover the pistol."

Apparently the trial court admitted the testimony just quoted on the theory that its admission did not violate Washington's privilege against self-incrimination afforded by the Fifth Amendment to the Constitution of the United States in that such privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature" (Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908; United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149), and the admitted testimony was not of a testimonial or communicative nature.

We are of the opinion that the testimony of Deal to the effect that Washington "agreed" to go to Tallahassee, Florida, to recover the pistol was evidence of a "testimonial or communicative nature" within the meaning of those words as used in Schmerber v. California, *supra,* and that the admission of such testimony was error to reverse.

Although Deal's statement that Washington "agreed" may not be subject to the vice of being a conclusion or a mere opinion of the witness,[1] it is but a shorthand rendition of what transpired between Washington and his interrogators, including the fact that after the promises were made to him he said (admitted) that he had a pistol; he said (admitted) that it was hidden in Tallahassee, Florida; and he said (admitted) that he would accompany some of his interrogators to Tallahassee to find the pistol.

We are holding that the incriminating admissions included in the word "agreed" were not admissible under Orozco v. Texas, *supra*. We are not holding that absent those admissions it would have been reversible error for the State to have shown that Washington offered to conduct the the officers to the place where the pistol

---

1. Anderson v. Snow, 9 Ala. 247; Griffin v. Isbell, 17 Ala. 184; Saltmarsh v. Bower & Co., 34 Ala. 613; Holman v. Clark, 148 Ala. 286, 41 So. 765. But see Fields v. Copeland, 121 Ala. 644, 26 So. 491.

was located and that he did accompany them to that place, where the pistol was recovered. Banks v. State, 84 Ala. 430, 4 So. 382. The writer, however, doubts that the holding in Banks v. State for which it is here cited and similar holdings in other cases should be followed after Malloy v. Hogan, *supra*; Orozco v. Texas, *supra*; and other cases wherein the Self-Incrimination Clause of the Fifth Amendment to the Constitution of the United States has been applied in proceedings in state courts as well as in federal courts.

The writer entertains the view that the holding in *Banks, supra,* and other similar holdings run counter to the holding of the Supreme Court of the United States in Orozco v. Texas, *supra*.

We have heretofore shown that on every occasion on which Washington was interrogated he was given the so-called Miranda warnings almost in the language of the opinion in that case. In no instance, however, was Washington advised that he was being questioned concerning the Sailors murder. Miranda does not hold that a witness who is being interrogated must be advised of the crime about which he is being questioned when the warnings expressly required are given, but, it may be that it will be so held by the Supreme Court of the United States. In fact, in Schenk v. Ellsworth, D. C., 293 F.Supp. 26, 29, it was said:

> " * * * We are not establishing a requirement that a suspect be advised with technical precision what formal charge or charges are contemplated. We are saying that when a person is in custody and, for all practical purposes, charged with a crime, Escobedo v. Illinois, 378 U.S. 478, 486, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), then he must be told of the crime he is suspected of having committed before a statement can be taken. Certainly it stands to reason

that a suspect cannot intelligently make the decision as to whether he wants counsel if knowledge of the crime suspected is withheld from him. This knowledge is a necessity for the free exercise of the right to counsel."

In this case we are inclined to the view that Washington did in fact intelligently make the decision that he did not want counsel during the interrogations which, in so far as he was advised, related to the crimes for which he had been arrested. We do not hold, because it is not necessary to do so in this case, that the record would support a finding that Washington would have waived the presence of counsel if he had known he was being questioned concerning the killing of Sailors.

There is a rule against the admissibility of evidence concerning a prior offense and certain it is that the record in this case is filled with such evidence. But there are certain well-recognized exceptions to that rule. Among the exceptions to the so-called rule of exclusion, recognized in this state, is that where a question is raised as to the identity of the person committing the offense, evidence of other offenses is sometimes admitted for the purpose of establishing his identity. Brasher v. State, 249 Ala. 96, 30 So.2d 31.

We see no occasion on this appeal to pass on the question as to whether or not the trial court erred in permitting the State to go into such great detail in regard to the prior offenses, although the question of identity was of paramount importance.

For the error above indicated, the judgment of the trial court is reversed and the cause is remanded.

Reversed and remanded.

HEFLIN, C. J., and MERRILL, HARWOOD and MADDOX, JJ., concur.