## OROZCO *v.* TEXAS.

No. 641. Argued February 26, 1969.—Decided March 25, 1969.

*Charles W. Tessmer* argued the cause and filed a brief for petitioner.

*Lonny F. Zwiener,* Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *Crawford C. Martin,* Attorney General, *Nola White,* First Assistant Attorney General, *Hawthorne Phillips,* Executive Assistant Attorney General, *Robert C. Flowers,* Assistant Attorney General, and *W. V. Geppert.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner, Reyes Arias Orozco, was convicted in the Criminal District Court of Dallas County, Texas, of murder without malice and was sentenced to serve in the state prison not less than two nor more than 10 years. The Court of Criminal Appeals of Texas affirmed the conviction, rejecting petitioner's contention that a material part of the evidence against him was obtained in violation of the provision of the Fifth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, that: "No per-

son . . . shall be compelled in any criminal case to be a witness against himself." [1]

The evidence introduced at trial showed that petitioner and the deceased had quarreled outside the El Farleto Cafe in Dallas shortly before midnight on the date of the shooting. The deceased had apparently spoken to petitioner's female companion inside the restaurant. In the heat of the quarrel outside, the deceased is said to have beaten petitioner about the face and called him "Mexican Grease." A shot was fired killing the deceased. Petitioner left the scene and returned to his boardinghouse to sleep. At about 4 a. m. four police officers arrived at petitioner's boardinghouse, were admitted by an unidentified woman, and were told that petitioner was asleep in the bedroom. All four officers entered the bedroom and began to question petitioner. From the moment he gave his name, according to the testimony of one of the officers, petitioner was not free to go where he pleased but was "under arrest." The officers asked him if he had been to the El Farleto restaurant that night and when he answered "yes" he was asked if he owned a pistol. Petitioner admitted owning one. After being asked a second time where the pistol was located, he admitted that it was in the washing machine in a backroom of the boardinghouse. Ballistics tests indicated that the gun found in the washing machine was the gun that fired the fatal shot. At petitioner's trial, held after the effective date [2] of this Court's decision in *Miranda* v. *Arizona,* 384 U. S. 436 (1966), the trial court allowed one of the officers,

---

[1] The state court also rejected a contention that use of the evidence also violated the Fourth Amendment's provision against unreasonable searches and seizures. Our holding makes it unnecessary for us to consider that contention.

[2] See *Johnson* v. *New Jersey,* 384 U. S. 719 (1966).

over the objection of petitioner's lawyer,[3] to relate the statements made by petitioner concerning the gun and petitioner's presence at the scene of the shooting. The trial testimony clearly shows that the officers questioned petitioner about incriminating facts without first informing him of his right to remain silent, his right to have the advice of a lawyer before making any statement, and his right to have a lawyer appointed to assist him if he could not afford to hire one. The Texas Court of Criminal Appeals held, with one judge dissenting, that the admission of testimony concerning the statements petitioner had made without the above warnings was not precluded by *Miranda*. We disagree and hold that the use of these admissions obtained in the absence of the required warnings was a flat violation of the Self-Incrimination Clause of the Fifth Amendment as construed in *Miranda*.

The State has argued here that since petitioner was interrogated on his own bed, in familiar surroundings, our *Miranda* holding should not apply. It is true that the Court did say in *Miranda* that "compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U. S., at 461. But the opinion iterated and reiterated the absolute necessity for officers interrogating people "in custody" to give the described warnings. See *Mathis* v. *United States,* 391 U. S. 1

---

[3] The State appears to urge that petitioner's *Miranda* claim is unreviewable in this Court because the objection made by trial counsel to the officer's testimony was not sufficiently "specific." We fail to perceive how this could be an adequate state ground in view of the fact that the Texas Court of Criminal Appeals specifically decided that the introduction of petitioner's statement made to the officers "was not precluded under Miranda v. State of Arizona," 428 S. W. 2d 666, 672, while the dissenting judge thought that it was.

(1968). According to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning. The *Miranda* opinion declared that the warnings were required when the person being interrogated was "in custody at the station *or otherwise deprived of his freedom of action in any significant way."* 384 U. S., at 477. (Emphasis supplied.) The decision of this Court in *Miranda* was reached after careful consideration and lengthy opinions were announced by both the majority and dissenting Justices. There is no need to canvass those arguments again. We do not, as the dissent implies, expand or extend to the slightest extent our *Miranda* decision. We do adhere to our well-considered holding in that case and therefore reverse [4] the conviction below.

*Reversed.*

MR. JUSTICE FORTAS took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring.

The passage of time has not made the *Miranda* case any more palatable to me than it was when the case was decided. See my dissenting opinion, and that of MR. JUSTICE WHITE, in *Miranda* v. *Arizona,* 384 U. S. 436, 504, 526 (1966).

Yet, despite my strong inclination to join in the dissent of my Brother WHITE, I can find no acceptable avenue of escape from *Miranda* in judging this case, especially in light of *Mathis* v. *United States,* 391 U. S. 1 (1968), which has already extended the *Miranda* rules beyond the

---

[4] In light of some apparent misunderstanding on this point, it is perhaps appropriate to point out once again that a reversal by this Court of a conviction based in part on unconstitutional evidence leaves the State free to retry the defendant without the tainted evidence.

police station, over the protest of JUSTICES STEWART, WHITE, and myself, *id.*, at 5–8. Therefore, and purely out of respect for *stare decisis*, I reluctantly feel compelled to acquiesce in today's decision of the Court, at the same time observing that the constitutional condemnation of this perfectly understandable, sensible, proper, and indeed commendable piece of police work highlights the unsoundness of *Miranda*.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEWART joins, dissenting.

This decision carries the rule of *Miranda* v. *Arizona,* 384 U. S. 436 (1966), to a new and unwarranted extreme. I continue to believe that the original rule amounted to a "constitutional straitjacket" on law enforcement which was justified neither by the words or history of the Constitution, nor by any reasonable view of the likely benefits of the rule as against its disadvantages. 384 U. S., at 526. Even accepting *Miranda*, the Court extends the rule here and draws the straitjacket even tighter.

The opinion of the Court in *Miranda* was devoted in large part to an elaborate discussion of the subtle forms of psychological pressure which could be brought to bear when an accused person is interrogated at length in unfamiliar surroundings. The "salient features" of the cases decided in *Miranda* were "incommunicado interrogation of individuals in a police-dominated atmosphere." 384 U. S., at 445. The danger was that in such circumstances the confidence of the prisoner could be eroded by techniques such as successive interrogations by police acting out friendly or unfriendly roles. These techniques are best developed in "isolation and unfamiliar surroundings," 384 U. S., at 450. And they take time: "the major qualities an interrogator should possess are patience and perseverance." *Ibid.* The techniques

of an extended period of isolation, repeated interrogation, cajolery, and trickery often enough produced admissions which were actually coerced in the traditional sense so that new safeguards were deemed essential.

It is difficult to believe that the requirements there laid down were essential to prevent compulsion in every conceivable case of station house interrogation. Where the defendant himself as a lawyer, policeman, professional criminal, or otherwise has become aware of what his right to silence is, it is sheer fancy to assert that his answer to every question asked him is compelled unless he is advised of those rights with which he is already intimately familiar. If there is any warrant to *Miranda* at all, it rests on the likelihood that in a sufficient number of cases exposure to station house practices will result in compelled confessions and that additional safeguards should be imposed in all cases to prevent possible erosion of Fifth Amendment values. Hence, the detailed ritual which *Miranda* fashioned.

The Court now extends the same rules to all instances of in-custody questioning outside the station house. Once arrest occurs, the application of *Miranda* is automatic. The rule is simple but it ignores the purpose of *Miranda* to guard against what was thought to be the corrosive influence of practices which station house interrogation makes feasible. The Court wholly ignores the question whether similar hazards exist or even are possible when police arrest and interrogate on the spot, whether it be on the street corner or in the home, as in this case. No predicate is laid for believing that practices outside the station house are normally prolonged, carried out in isolation, or often productive of the physical or psychological coercion made so much of in *Miranda*. It is difficult to imagine the police duplicating in a person's home or on the street those conditions and practices

which the Court found prevalent in the station house and which were thought so threatening to the right to silence. Without such a demonstration, *Miranda* hardly reaches this case or any cases similar to it.

Here, there was no prolonged interrogation, no unfamiliar surroundings, no opportunity for the police to invoke those procedures which moved the majority in *Miranda*. In fact, the conversation was by all accounts a very brief one. According to uncontradicted testimony, petitioner was awake when the officers entered his room, and they asked him four questions: his name, whether he had been at the El Farleto, whether he owned a pistol, and where it was. He gave his name, said he had been at the El Farleto, and admitted he owned a pistol without hesitation. He was slow in telling where the pistol was, and the question was repeated. He then took the police to the nearby washing machine where the gun was hidden.

It is unquestioned that this sequence of events in their totality would not constitute coercion in the traditional sense or lead any court to view the admissions as involuntary within the meaning of the rules by which we even now adjudicate claims of coercion relating to pre-*Miranda* trials. And, realistically, had Orozco refused to answer the questions asked of him, it seems most unlikely that prolonged interrogation would have followed in petitioner's own quarters; nothing similar to the station house model invoked by the court would have occurred here. The police had petitioner's name and description, had ample evidence that he had been at the night club and suspected that he had a gun. Surely had he refused to give his name or answer any other questions, they would have arrested him anyway, searched the house and found the gun, which would have been clearly admissible under all relevant authorities. But the Court insists that this case be reversed for failure to give *Miranda* warnings.

I cannot accept the dilution of the custody requirements of *Miranda* to this level, where the hazards to the

right to silence are so equivocal and unsupported by experience in a recurring number of cases. Orozco was apprehended in the most familiar quarters, the questioning was brief, and no admissions were made which were not backed up by other evidence. This case does not involve the confession of an innocent man, or even of a guilty man from whom a confession has been wrung by physical abuse or the modern psychological methods discussed in *Miranda*. These are simply the terse remarks of a man who has been caught, almost in the act. Even if there were reason to encourage suspects to consult lawyers to tell them to be silent before quizzing at the station house, there is no reason why police in the field should have to preface every casual question of a suspect with the full panoply of *Miranda* warnings. The same danger of coercion is simply not present in such circumstances, and the answers to the questions may as often clear a suspect as help convict him. If the *Miranda* warnings have their intended effect, and the police are able to get no answers from suspects, innocent or guilty, without arresting them, then a great many more innocent men will be making unnecessary trips to the station house. Ultimately it may be necessary to arrest a man, bring him to the police station, and provide a lawyer, just to discover his name. Even if the man is innocent the process will be an unpleasant one.

Since the Court's extension of *Miranda*'s rule takes it into territory where even what rationale there originally was disappears, I dissent.

Memorandum of MR. JUSTICE STEWART.

Although there is much to be said for MR. JUSTICE HARLAN's position, I join my Brother WHITE in dissent. It seems to me that those of us who dissented in *Miranda* v. *Arizona*, 384 U. S. 436, remain free not only to express our continuing disagreement with that decision, but also to oppose any broadening of its impact.