In re SMALLEY.

[Cite as *In re Smalley* (1989), 62 Ohio App.3d 435.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 54979.

Decided Feb. 6, 1989.

438

*Sanford I. Atkin,* for petitioner Michelle Smalley.

*John T. Corrigan,* prosecuting attorney, and *Laurence R. Snyder,* for respondent state of Ohio.

McMANAMON, Chief Judge.

Minor Michelle Smalley appeals a delinquency adjudication and dispositional order. In its entries the juvenile court found that Smalley committed acts which, if committed by an adult, would constitute possession of criminal tools (R.C. 2923.24), falsification (R.C. 2921.13[A][3]), forgery (R.C. 2913.31[A][2]), obstructing justice (R.C. 2921.32[A][5]), and drug trafficking (R.C. 2925.-03[A][1]).

In a timely appeal, Smalley raises six assignments of error.[1] Because we find her arguments well taken in part, we reverse her adjudication of

---

1. Appellant's assignments of error are:

I

"The trial court erred to the prejudice of the petitioner by overruling the petitioner's motion to suppress as the warrantless search of her home and the seizure of certain evidence used to prosecute and convict her went beyond the legal scope of the search."

delinquency for possession of criminal tools and drug trafficking. We affirm her adjudication of juvenile delinquency on forgery, falsification and obstruction of justice charges.

Smalley's first three assignments of error contend that the juvenile court admitted evidence which was obtained in violation of her Fourth and Fifth Amendment rights. Smalley filed a pretrial motion to suppress which the referee, over Smalley's objection, consolidated with the trial of the general issues. Although the consolidation resulted in some confusion during the hearing, the referee's procedure has not been assigned as error.

The complaint against Smalley, who was then sixteen, arose during police efforts to locate her boyfriend, Robert Brown, who was sought by police for aggravated murder. Detective Timothy Patton testified that police believed Brown was staying at a West 46th Street address where Smalley resided with her mother. On the afternoon of February 5, 1987, about a month after the murder, Patton and another officer drove to the address to execute an arrest warrant for Brown. The officers saw Brown's auto parked behind the Smalley residence and radioed for assistance from the police S.W.A.T. unit. Meanwhile, a red rental car pulled into the driveway and its occupant, a woman, entered the house.

When a six-member S.W.A.T. team arrived, four of them conducted an unsuccessful search of the house for Brown. Patton averred that he and the other officers then entered the residence, and at least one member of the S.W.A.T. unit remained inside for the duration of their visit. Patton asked the woman, who was in fact Michelle Smalley, for identification. She responded that her name was Lillian Latin and showed Patton a driver's license which bore that name, listing her age as twenty-two. In response to Patton's queries, Smalley told him that Michelle was at school. She volunteered that she had answered a long-distance telephone call from Brown, who was looking for Michelle. When asked why she was wearing jewelry monogrammed with

---

II

"The trial court erred to the prejudice of the petitioner by overruling the petitioner's motion to suppress as the petitioner was under arrest and not informed of her rights before she made incriminating statements that were used to prosecute and convict her."

III

"The trial court erred to the prejudice of the petitioner by overruling the petitioner's motion to suppress as the petitioner was denied her right to counsel after requesting the assistance of counsel during the police interrogation."

IV

"The trial court's judgment is contrary to law."

V

"The trial court's judgment is contrary to the weight of the evidence."

VI

"For other errors manifested upon the fact of the record and prejudicial to the rights of the petitioner."

the letter "M," Smalley explained she borrowed it from Michelle. This explanation apparently satisfied Patton, who decided to wait in the house until Michelle returned from school.

A digital pager carried by Smalley sounded numerous times during Patton's visit. Patton returned one of the phone calls himself, and asked Smalley to return six others while he listened on an extension. The callers wished to purchase cocaine from Michelle. "Lillian" told them that Michelle was not home and that they should call back later.

At some point Smalley's sister, Yolanda Boyce, arrived at the house. Patton asked her to identify herself, and apparently advised her of her constitutional rights. Boyce perpetuated the ruse upon Officer Patton, telling him that Michelle was at school and that she sometimes did not come home at all. After waiting about two hours for Michelle to return, possibly with Brown, Patton requested Smalley to accompany him to the police station for further questioning. He asked Boyce to tell Michelle and her mother to contact the police when they arrived home.

During an interview at the police station Smalley described the relationship between Brown and Michelle and their activities in distributing illegal drugs. About two hours after their arrival at the station, police received a telephone call from Michelle's mother, Geneva Smalley. Patton described Michelle to Mrs. Smalley and told her the girl identified herself as Lillian Latin. He advised Mrs. Smalley to come to the station if she believed the girl was her daughter.

When Patton told Michelle about the phone call she admitted her true identity. The officer did not question her further until her mother arrived. At that time, according to Patton, both Michelle and her mother were given the warnings required by *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Neither woman requested an attorney, and the interview continued.

Patton estimated that the digital pager sounded ninety times in his presence. At the request of police, Smalley again returned some of the phone calls. As before, the callers were seeking to purchase illegal drugs. Patton related that Smalley would tell the callers that "she couldn't, she didn't have anything with her at the time."

Smalley admitted to police that she assisted Brown in distributing cocaine he sent from Florida. She told them she spent the previous weekend at the Florida home of Brown's wife, Vicky, who paid for her air fare. Smalley saw Brown each day she was in Florida and had wired him $4,000 from Cleveland at his request. She gave police her airline boarding passes and a Western Union receipt for $4,000 issued in the name of Lillian Latin. Smalley

explained that she obtained the bogus driver's license by using a birth certificate which belonged to a friend.

The stationhouse interview lasted about two hours. At its conclusion Patton advised Michelle that she was not under arrest and that she should return the following day.

Defense counsel presented the testimony of Geneva Smalley and, for purposes of the suppression motion, Michelle Smalley. According to Michelle, Officer Patton entered her home with the S.W.A.T. team, and they conducted a search of the entire house, including drawers and a wastebasket. She testified that Patton's partner searched her and seized the digital pager from her jacket pocket, and that Patton found the airline boarding passes in a wastebasket inside the home. Patton seized the Western Union receipt from her purse, she averred, at the police station before her mother arrived. At no time did police inform her of her constitutional rights, though Patton informed her she was under arrest when they left the house for the station. She maintained that she lied about her identity because she was scared. She denied that the digital pager was hers, and could not remember who gave her the $4,000 she wired to Florida. Patton allegedly threatened to put her in jail until Brown was apprehended if she refused to cooperate.

Geneva Smalley testified that police never advised them of Michelle's constitutional rights. Mrs. Smalley averred that police ignored her repeated request for an attorney at the station. When asked about the digital pager she testified that "the beeper went off and he told her to answer the call back, or whatever. He called back and told Michelle to pick up the other phone and he was on one phone." In a report adopted by the juvenile court judge, the referee accepted Officer Patton's version of the events, finding that Michelle's testimony was not credible. From Patton's testimony the referee inferred that Michelle voluntarily accompanied him to the police station in an attempt to continue her masquerade as Lillian Latin. The referee opined that Michelle was deeply involved in Brown's illegal activities and exhibited a sophistication in police matters beyond her sixteen years.

Smalley's first assignment of error contends evidence was seized from her mother's house in violation of her Fourth Amendment protection from unreasonable searches and seizures. Smalley argues that the police exceeded the authority of the arrest warrant by searching in places, such as drawers, where Brown could not possibly have been hiding. Since Smalley has not challenged the lawfulness of the initial entry by the S.W.A.T. unit, we shall confine our review to the search which followed.

■ The police did not violate Smalley's Fourth Amendment rights by asking for her name and proof of identity. Temporary detention for the

purpose of investigative questioning is permissible if police have articulable suspicion that a person has committed or is about to commit a crime. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. The police clearly had reason to believe Smalley was providing refuge for the fugitive Brown. Thus, her response to the request for identification as well as the bogus driver's license she provided were admissible as evidence.

■ The state maintains that no evidence seized from the house was used against Smalley at trial. Officer Patton testified that the airline boarding passes and the Western Union receipt were taken from Smalley at the police station after her true identity was discovered. Although Smalley disputed Patton's version, the fact-finder was entitled to resolve this credibility issue in favor of the state. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. Considered alone, the seizure of these items was lawful as part of a search incident to arrest for her use of the false identification. *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

■ The seizure of Smalley's digital pager, however, cannot be justified. Officer Patton did not explain at trial how he gained possession of the pager. According to the only evidence on the issue—Smalley's testimony—Patton's partner removed the device from her jacket pocket while they were in her mother's home. It is clear that Patton returned the first phone call on the pager and determined that the caller wished to purchase cocaine. Only then did he ask Smalley to return the subsequent calls while he listened "with her permission." There is no evidence she consented to the initial seizure of the pager. Since Patton professed he believed Smalley was "Lillian Latin," the seizure cannot be legitimized by reference to any criminal activities by Smalley.

■ We must next determine whether any other evidence was tainted by the illegal seizure. The exclusionary rule applies to all items of evidence, tangible or intangible, which were the "fruit" of the constitutional violation. In *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, the court defined the scope of the remedy:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* at 487–488, 83 S.Ct. at 417, quoting Maguire, Evidence of Guilt (1959) 221.

The chain of tainted evidence begins with the telephone calls she "voluntarily" returned at the request of Officer Patton while posing as "Lillian." Her description of Michelle's drug trafficking with Brown was likewise inadmissible since it was the illegal seizure which compelled her to account for the phone calls. Moreover, the similar admissions she made at the police station after police learned her actual identity were no less tainted. *Miranda* warnings do not by themselves attenuate the taint of an illegal arrest. *Brown v. Illinois* (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. The warnings are even less effective in the case of an illegal search since the continued presence of the incriminating evidence is inherently exploitative. See 4 LaFave, Search and Seizure (1987) 403–407, Section 11.4(c).

Accordingly, the adjudication for possessing criminal tools—the digital pager—must be reversed. Further, the adjudication for drug trafficking cannot stand in view of the tainted evidence which comprises its purported basis.

However, we hold that the illegal search did not taint the evidence which underlies her adjudication for obstructing justice. As we have noted, the police lawfully seized the Western Union receipt during a search incident to arrest. Her admission that she wired money to Brown logically flows from this lawful seizure, rather than from the illegal search that produced the digital pager. Since her admissions were obtained from a source independent of the tainted evidence, exclusion was not warranted. See *Wong Sun, supra,* 371 U.S. at 487, 83 S.Ct. at 417; *Silverthorne Lumber Co., Inc. v. United States* (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.

Further, since Smalley's use of the false identification preceded the illegal search, the adjudications for forgery and falsification did not violate her Fourth Amendment rights.

Thus, the first assignment of error is sustained in part.

In her second assignment of error Smalley argues that police elicited statements from her at both her house and the police station without informing her of her *Miranda* rights. Smalley's third assignment contends that police ignored her mother's requests for an attorney.

The Fifth Amendment privilege against self-incrimination is applicable to juveniles as well as adults. *In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527. The *Miranda* warnings must be provided to any person who is "subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." *Miranda, supra,* 384 U.S. at 477, 86 S.Ct. at 1629. We hold that Smalley was

not in custody, within the meaning of *Miranda,* at any time before police discovered her true identity.

A person is considered to be "in custody" when his freedom of action is "curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty* (1984), 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (quoting *California v. Beheler* [1983], 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275). The curtailment of freedom is distinct from and exceeds whatever coercive aspects inhere in a police interview. *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714. Although the locale of the interview is important, it is the compulsive nature of the circumstances in their totality which determines whether detention is custodial. Compare *Orozco v. Texas* (1969), 394 U.S. 324, 327, 89 S.Ct. 1095, 1097, 22 L.Ed.2d 311 (warnings required in home of suspect who was "under arrest and not free to leave") with *Beckwith v. United States* (1976), 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (warnings unnecessary when federal agents were voluntarily admitted into suspect's occasional residence, and interview was "friendly" and "relaxed") and *Mathiason, supra* (warnings unnecessary when suspect voluntarily came to stationhouse for short interview, and was informed he was not under arrest). The pertinent viewpoint is "how a reasonable man in the suspect's position would have understood his situation. * * * " *Berkemer v. McCarty, supra,* 468 U.S. at 442, 104 S.Ct. at 3151.

Admittedly, the presence of armed S.W.A.T. team officers in the Smalley home and the display of authority attendant to their search of the premises are indications of custodial detention. We cannot, however, ignore the significance of Michelle's deliberate subterfuge. Under the peculiar facts established in the juvenile court proceedings, we have no occasion to consider whether Michelle Smalley was in custody in her home. Rather, the issue is whether "Lillian Latin" was so restricted in her freedom of action as to render her "in custody." We conclude she was not. "Lillian" was detained for the limited purpose of determining her knowledge of Brown's whereabouts, and there is no indication she was not free to leave after divulging this information. The fact that she remained in the house may be attributed, consistent with the referee's findings, to her desire to continue her masquerade as Lillian Latin.

We likewise are not persuaded that the mere change of locale to the police station required police to administer the *Miranda* warnings. Until the phone call from Mrs. Smalley, the information elicited from "Lillian" at the station consisted solely of Michelle Smalley's involvement in illegal drug transactions. Although the stationhouse setting was perhaps more coercive than before, the

other circumstances bearing on the issue of custodial interrogation remained the same.

Smalley, citing her own testimony and that of her mother, contends police did not provide the *Miranda* rights after they learned her true identity. In her third assignment she maintains that police refused her mother's request for an attorney. The factual basis of these claims was disputed at trial, and the referee's determination against Michelle on these issues was within his authority as fact-finder. *DeHass, supra.* We shall, however, review her claim that the alleged waiver of rights was ineffective under the circumstances.

 A defendant is free to waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda, supra,* 384 U.S. at 475, 86 S.Ct. at 1628. A reviewing court is required to consider the totality of the circumstances to determine whether (1) the waiver was a voluntary exercise of will rather than the product of intimidation or coercion; and (2) the defendant was fully aware of the nature of the right and the consequences of his decision to waive it. *Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410. Waivers by minors must be scrutinized closely since the validity of the waiver is affected by the factors of age, emotional stability and mental capacity. *State v. Bell* (1976), 48 Ohio St.2d 270, 277, 2 O.O.3d 427, 431, 358 N.E.2d 556, 562, sentence vacated (1978), 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010. See, also, *In re Gault, supra.*

 The record reflects that Officer Patton read the *Miranda* warnings to both Michelle and her mother, that they understood the rights, and that Michelle chose to continue the interview without an attorney. The presence of Mrs. Smalley as well as Michelle's "sophistication" in police matters are factors which tend to show the waiver was voluntary. Thus, we hold that the waiver of rights was effective, and statements Michelle made thereafter were admissible against her.

Accordingly, Smalley's second and third assignments of error are not well taken.

Although Smalley's appellate brief lists three additional assignments of error, she has not separately argued these issues. "Errors not specifically pointed out in the record and separately argued by brief may be disregarded." App.R. 12(A). In the exercise of our discretion, we decline to address her final three assignments. See *State v. Rivers* (1977), 50 Ohio App.2d 129, 134, 4 O.O.3d 100, 103, 361 N.E.2d 1363, 1367.

Accordingly, we reverse Smalley's adjudication for drug trafficking and possession of criminal tools. Because we find that the state fully established that Smalley committed the acts of obstructing justice, forgery and falsification, these adjudications will stand.

*Judgment affirmed in part*
*and reversed in part.*

MATIA and NAHRA, JJ., concur.