THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. V.S., Defendant-Appellee.

Second District   No. 2—91—0040

Opinion filed April 16, 1993.

James E. Ryan, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Stephen M. Komie and Michael T. Van Der Veen, both of Komie & Associates, of Chicago, for appellee.

JUSTICE QUETSCH delivered the opinion of the court:

The State indicted defendant, V.S., for criminal sexual assault and aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, pars. 12—13(a)(3), 12—16(b)). Defendant brought a motion to suppress his statements, alleging that the investigators had not read him the *Miranda* warnings prior to their interview with him. The trial court granted defendant's motion to suppress, and the State appeals. The issue on appeal is whether the investigators were obliged to read the *Miranda* warnings because defendant was the focus of their investigation.

Joyce Rizzo testified that she was a criminal investigator with the Du Page County State's Attorney's office and worked in the sexual abuse center. She had worked there for 2½ years and had eight years' prior experience as a municipal police officer. On April 4, 1990, she and Charles Munson, her partner, went to defendant's home at 2 p.m. Nobody answered the door, and Munson telephoned defendant's wife from the car and asked to meet with her to discuss a Department of Children and Family Services (DCFS) report. At 2:25 p.m. they noticed a woman cross the street and enter the house using a key. She then left as defendant's two daughters arrived on the school bus. The neighbor met the girls and walked them to her house. Defendant walked out of the house and walked down the driveway to the mailbox.

Rizzo exited her unmarked car and approached defendant, who identified himself. Rizzo showed him her badge and identification card and asked to speak with him about a report made to DCFS. She introduced Munson, who showed his badge and identification card. Neither of the officers carried weapons, and they were not in uniform. Defendant agreed to talk with them, and they all went into his house. Rizzo asked if they could sit at the dining room table, and he agreed. The dining room was connected to the kitchen without a door, and there was a phone in the kitchen. They sat opposite him at the table.

Rizzo advised defendant of the report of abuse and her conversation with D.S., his daughter. Defendant asked her what was going to happen. She told him her job was to investigate and collect information, not to determine whether charges would be brought. About 15 minutes later, defendant's wife came home, and she sat at the table. She suggested that defendant call a family friend who was an attorney, but defendant said he did not want to talk with him. D.S. arrived home and talked with her mother, who told her to go to the neighbor's house with her sisters.

Defendant's wife wanted to talk with defendant alone, and the officers left and sat outside in the car. After about four minutes, defendant's wife returned and said defendant wanted to talk with them. The officers sat at the table, and defendant's wife left on his request. The officers never told defendant he was under arrest. They did not restrain him. Two or three times, defendant stood up from the table and left the room to drink juice or to walk. He never told them that he did not understand what was happening. The officers first asked him about his age and employment. They then talked with him for another 30 minutes. They did not arrest him; he surrendered himself on May 18, 1990, after he was indicted.

Although Rizzo carried a *Miranda* card, neither she nor Munson read it to defendant. She had received a report that defendant had sexually abused his daughter. Rizzo had also talked to D.S. the day before at school, and D.S. named defendant as the perpetrator. Defendant was the only suspect of the investigation. Rizzo talked to one daughter, and Munson talked with the other daughter. The officers wanted to talk with the parents and with D.S.'s friends. Rizzo asked questions regarding whether a sexual assault occurred. Rizzo knew that sexual assault was a criminal offense. Rizzo did, however, encourage defendant to take his wife's advice to call an attorney, but Rizzo had not previously intended to suggest legal counsel. Rizzo did not try to contact defendant at his place of employment but drove to his house instead. She preferred to interview suspects in their own homes. They sat at a table so Munson could take notes. During the conversation, Rizzo told defendant several times that it was her intention to present the notes to the State's Attorney for a determination of whether to prosecute. She did not suggest to him that he cooperate or tell defendant that they would take his children away if he did not cooperate. She never asked defendant to write a statement in his own words.

The first conversation took 40 minutes from about 2:45 to 3:30, during which time Rizzo and Munson were alone with defendant for

15 minutes (without the presence of defendant's wife). The second conversation occurred when they returned from the car. This conversation took about 30 to 40 minutes, and they were alone with defendant except for 10 minutes when his wife was present. Prior to this incident, Rizzo had taken about 150 statements for prosecutions of criminal sexual assault cases and over a thousand statements overall.

Charles Munson testified that he had been an investigator with DCFS for 16 years. His statement of the facts was similar to Rizzo's, but he gave more details of the conversations. When Munson and Rizzo obtained the first report of abuse, they formed a plan to talk with D.S. before talking with defendant. They did not telephone defendant before driving to his house. Once there, they did not give him *Miranda* warnings or tell him he could be charged with a crime although they knew he could be charged based on the statements they adduced. Munson considered himself engaged in a "protective service investigation." He testified that Rizzo started the questioning at about 2:45 p.m. by stating she had interviewed D.S.; Rizzo advised him he was under no obligation to talk to the officers; and she said she wanted to hear defendant's side of the story. Defendant asked several times what would happen to him, but she said that she could not tell until she heard his side of the story. While Munson knew defendant could be charged with a felony, he did not read the *Miranda* warnings.

After defendant's wife arrived about 3 p.m., she encouraged him to tell the officers what happened. Munson did not tell them DCFS could take the children away from their custody. Defendant's wife said she was aware that a sexual incident had occurred once and she believed they needed some help. She asked defendant if it had occurred only once, and he said only once. She then said everyone was entitled to one mistake. Defendant did not make any admissions or denials until D.S. arrived at about 3:30 p.m. Defendant's wife talked with her and then asked her to come to the table. Defendant's wife asked her if the sex had occurred more than once. When D.S. affirmed that it had, her mother argued with her, and defendant put his head to the table and wept for several minutes. Defendant was highly emotional, and his wife took D.S. to another room and argued with her. Defendant's wife sent D.S. to the neighbor's house. Defendant's wife then told the officers she wanted to talk to defendant alone, and the officers walked to the car. In the car, Munson made a telephone call to arrange for a possible placement of a youth.

Several minutes later, defendant's wife told the officers defendant wished to talk with them, and then she went to the neighbor's house.

The officers went inside and talked with defendant for about 40 minutes. Sometimes defendant's voice was so soft they had to ask him to repeat his words louder, and sometimes he was crying. They were alone with defendant for 15 or 20 minutes before defendant's wife returned. The officers then discussed with her where D.S. would stay. Although they had a preprinted notification form to inform people of an investigation, they did not give the form to defendant until 4:30 p.m. when they were leaving and after they decided to take D.S. into protective custody. Munson also gave defendant a pamphlet which explained a parent's rights. Munson went with D.S. and her mother to pack some clothing. Munson left with D.S. Munson recollected that defendant made a telephone call during the conversation and walked around, too.

The trial court ruled that any statements made after the return of Rizzo and Munson into the house were inadmissible. The court found that the investigation had gone to the focal point and the *Miranda* warnings were required. The court stated, "At that time, the so-called Rubicon line had been crossed." The trial court granted defendant's motion concerning all statements made after the officers' reentry into the house. When the trial court denied the motion to reconsider, it stated that the officers had been confronting defendant. The court stated that the fact defendant was the focus of the investigation was only one factor in the court's analysis.

■ The issue on appeal is whether defendant was deemed to be in custody such that the failure of the detectives to warn defendant of his *Miranda* rights requires that defendant's oral statements be suppressed. The Supreme Court held in *Miranda* that an accused has the privilege against self-incrimination during a custodial interrogation and to be warned of his rights prior to the interrogation. (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 468-69, 16 L. Ed. 2d 694, 706, 720, 86 S. Ct. 1602, 1612, 1625; *People v. Melock* (1992), 149 Ill. 2d 423, 439.)

> "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way. (384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.) The ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. (*California v. Beheler* (1983), 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279, 103 S. Ct. 3517, 3520.) Although what constitutes police custody is not always self-evident, the Court in *Miranda* was concerned with interrogations that take place

in a police-dominated environment containing 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' *Miranda*, 384 U.S. at 467, 16 L. Ed. 2d at 719, 86 S. Ct. at 1624; see also *Berkemer v. McCarty* (1984), 468 U.S. 420, 437-38, 82 L. Ed. 2d 317, 333, 104 S. Ct. 3138, 3149.

The determination of whether an interrogation is custodial should focus on all of the circumstances surrounding the questioning, such as: the location, length, mood and mode of the interrogation; the number of police officers present; any indicia of formal arrest or evidence of restraint; the intentions of the officers; and the extent of knowledge of the officers and the focus of their investigation. (See *People v. Lucas* (1989), 132 Ill. 2d 399, 417.) The trial court must examine and weigh these factors, along with the credibility of the witnesses. It then must make an objective determination as to what a reasonable man, innocent of any crime, would perceive if he were in defendant's position." (*People v. Brown* (1990), 136 Ill. 2d 116, 124-25.)

(See *People v. Melock*, 149 Ill. 2d at 437, 440; *People v. Finklea* (1983), 119 Ill. App. 3d 448, 452.) We accept the trial courts' assessments of the credibility of the witnesses, and we will not disturb the trial court's finding unless it is manifestly erroneous. *People v. Ramey* (1992), 152 Ill. 2d 41, 58; *Brown*, 136 Ill. 2d at 125.

The State argues on appeal that defendant was not in custody and therefore the *Miranda* doctrine does not apply to suppress the statements. (*People v. Acebo* (1989), 182 Ill. App. 3d 403, 405.) Only statements made in a custodial atmosphere need be suppressed under *Miranda*. The State maintains that the detectives did not assert authority over defendant. The State argues that the trial court erred by applying the focus of the investigation test. Defendant describes the interrogation as emotional, a planned surprise, and an ambush on the only suspect of the complaint.

A court should consider an officer's knowledge and the focus of his investigation when determining what a reasonable person would think during an investigation; however, these inquiries alone will not likely control the conclusion whether the interrogation is custodial. (*Brown*, 136 Ill. 2d at 129.) The court may consider that the suspect was subjected to questioning which in large part was meant to elicit incriminating remarks to the charge. (136 Ill. 2d at 129. But see *Melock*, 149 Ill. 2d at 450 (accusatory interrogation not enough to determine confession involuntary).) While a suspect may be a target of an

investigation, the *Miranda* warnings are required only if the suspect is subjected to a custodial interrogation. (*Beckwith v. United States* (1976), 425 U.S. 341, 347, 48 L. Ed. 2d 1, 8, 96 S. Ct. 1612, 1616; *Finklea*, 119 Ill. App. 3d at 453.) "In determining whether a statement was made in a custodial setting, the court must look to all of the circumstances surrounding the questioning, with no single factor deemed controlling, and then objectively evaluate whether a reasonable, innocent person would have believed he was free to leave or was expressly or impliedly bound to remain in the presence of police." *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028.

Ostensibly, the trial court applied the correct test. While it did mention that defendant was the focus of the investigation, the court stated that the focus was only one factor it considered to determine the atmosphere of the interview. The *Miranda* rule applies to DCFS investigators (*People v. Hagar* (1987), 160 Ill. App. 3d 370, 375), and the intent and focus of the interrogators are relevant factors to consider (160 Ill. App. 3d at 373).

■ Nevertheless, we believe that the trial court erred in suppressing the statements. The fundamental issue was whether the interview was custodial. While a custodial situation can occur in the home (*Orozco v. Texas* (1969), 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095), the relevant inquiry is whether a reasonable man would believe he was expressly or impliedly bound to remain in the presence of the officials (*Savory*, 105 Ill. App. 3d at 1028). The record does not support such a belief. Defendant was not deprived of his freedom of action in any significant way. (*Orozco*, 394 U.S. at 327, 22 L. Ed. 2d at 315, 89 S. Ct. at 1097.) The officers left when asked, defendant was free to walk in his kitchen or to call for advice, and they told him he was not obliged to talk with them. Unlike *Hagar*, defendant was not interrogated in a windowless room at the DCFS office with the doors closed. In *Hagar*, other investigators were waiting to begin their own interrogation, and one investigator testified the defendant was in a custodial setting. (*Hagar*, 160 Ill. App. 3d at 374-75.) By contrast, the record does not establish that the setting in the cause before the court was custodial. Thus, the finding of the trial court, at this stage of the hearing, was manifestly erroneous, and we must reverse.

Because the order arose from a motion for a directed finding (see *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154-55), we must remand the cause for a continued hearing. Supreme Court Rule 366(b)(3)(iii) (134 Ill. 2d R. 366(b)(3)(iii)) requires this court to remand the cause with

directions to proceed as though the motion for a directed finding had been denied by the trial court.

For the above reasons, the order of the circuit court is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

INGLIS, P.J., and McLAREN, J., concur.