OPINION
{¶ 1} This is an appeal from the judgment of the Court of Common Pleas of Portage County entered upon a jury's verdict finding appellant, Jason M. Wassil, guilty of rape and complicity to kidnapping. Appellant additionally appeals the trial court's judgment entry on sentence.
 {¶ 2} At approximately 12:30 a.m. on December 21, 2003, appellant and two friends, Josh Ely and Brandon Bailey, arrived at a bar known as "Slim and Jumbo's." Earlier in the evening, Mary Ann Anderson, the victim, and a co-worker/friend, Melissa Cree, had met friends at the same establishment. Near closing time, Ely approached Anderson and asked her to dance. Anderson, who was 41 years old, asked Ely his age; accordingly to Anderson, Ely indicated he was 29. In fact, Ely was 19. After dancing, Ely asked Anderson for her phone number which she provided. At approximately 2:30 a.m., Anderson and Cree returned to Anderson's home. The women planned on staying up for the remainder of the night as they had to be at work by 5:00 a.m.
 {¶ 3} At 2:42 a.m. Anderson received a telephone call from Ely who, according to Anderson, invited her to breakfast. Anderson initially declined, explaining she had to be at work at 5:00 a.m.; however, Anderson eventually accepted Ely's invitation. Anderson provided Ely with directions to her home and he arrived a short time later. Ely greeted Anderson as she exited her home and ushered her into the front passenger seat of the vehicle. Anderson was surprised to notice another male, later identified as Bailey, driving the vehicle. Ely entered the vehicle and indicated his friend was driving because he had no car. Anderson accepted Ely's explanation and they left Anderson's home.
 {¶ 4} While they were driving, Anderson testified Ely kissed her on the cheek. Anderson stated she was not concerned or threatened by this because it was just a peck. Ely then announced he forgot his wallet at Bailey's home and desired another beer. Rather than going to a restaurant, Bailey turned into a trailer park and stopped at his residence. Anderson testified she was not alarmed by this sudden change of direction because forgetting one's wallet was not uncommon. At Bailey's trailer, Ely exited the vehicle, followed by Anderson with Bailey in tow. When the three entered the trailer, Ely retreated to the kitchen and Anderson removed her shoes. Anderson testified she always removes her shoes upon entering another's home because she believed it polite.
 {¶ 5} While playing with a kitten, she noticed an individual, who she thought was Bailey, pass her and go into a backroom of the trailer. She stated she did not pay specific attention to the passer-by but looked up and noticed the door was closed. Ely emerged from the kitchen with two beers, one of which he offered Anderson. Anderson declined because she needed to be at work in two hours. Ely then confessed he had no money to go to breakfast. Anderson testified she did not find this out of the ordinary because it was not uncommon to overestimate one's funds after going out. Anderson and Ely then sat on the couch where they began to kiss. The couple fell recumbent upon the couch kissing and embracing one another when Ely asked if Anderson would engage in a "threesome" with him and "his dude." According to Anderson, she was offended by the offer and immediately declined. Ely brushed the suggestion off as a joke and the two continued kissing.
 {¶ 6} Shortly thereafter Anderson testified she was pushed to the floor of the trailer where Ely grabbed her ankles and Bailey, who stood 6'1 and weighed 250-275 lbs secured her arms. Ely "ripped" Anderson's pants and underwear off while Bailey violently removed her shirt and bra. Anderson, now completely nude, was sexually assaulted by the two men; Anderson testified she was forced to perform oral sex upon Bailey while Ely performed oral sex upon her and had intercourse with her. She testified Bailey slapped her in the face several times during the episode. Anderson testified her assailants ultimately switched positions and bullied her into the back bedroom where the assault continued. At 4:30 a.m., Bailey's alarm sounded. At this point, the assault ceased. Anderson testified she aggressively resisted the assault and continually maintained she was raped by only Ely and Bailey.
 {¶ 7} Anderson put her clothes back on and Ely drove her to work. She arrived at work slightly late.[1] Anderson entered the factory and encountered a female co-worker. The co-worker flippantly remarked "[o]h you're running late too", at which point Anderson broke down and stated she had been raped. The police were notified and Anderson was taken to the hospital. The attending emergency room physician conducted an examination and observed redness on Anderson's inner thigh, dark bluish bruises on her calf, abrasions and scratches on her knees, scratches on her legs and bruising, swelling and redness around her vaginal area. Ultimately, Detective Elizabeth Hurd was dispatched to speak with Anderson. Anderson described the episode to Hurd and gave a description of the two suspects, the vehicle, and the trailer at which the assault occurred.
 {¶ 8} Armed with this information, Hurd located a trailer with a vehicle matching Anderson's description. She knocked on the door, but no one was home. At approximately 3:00 p.m., Detective Daniel Burns arrived at the North Post, an old "Town Hall" used as a police outpost. Detective Hurd subsequently debriefed Burns on the rape investigation and Burns returned to the trailer park to check the trailer observed earlier by Hurd. After arriving at the trailer park, Burns discovered Bailey at home. Burns contacted Hurd and the detectives obtained a statement from Bailey; during his statement, the detectives learned that Ely and appellant were also involved in the episode. Using Bailey's cell phone, Burns called Ely and asked him to come down to the North Post. Ely agreed.
 {¶ 9} Ely arrived at the North Post at approximately 7:00 p.m. Although appellant was not summoned by Burns, he arrived as a passenger in Ely's truck. Burns escorted Ely into the North Post where Hurd conducted an interview. Burns then returned to the truck and retrieved appellant to hear his version of the events as they occurred. According to Burns, appellant cooperated and offered to provide a voluntary statement. Burns, who was in plain clothes, escorted appellant to a large room on the first floor of the North Post to take his statement. At no time was appellant provided with Miranda warnings. According to Burns, appellant's first version of the story did not include any reference to Anderson. Burns confronted appellant about this omission and appellant candidly stated he left out the information because he viewed it "private." After about forty-five minutes of discussing appellant's version of the story, Burns asked appellant if he would be willing to provide a tape recorded statement. Appellant acceded.
 {¶ 10} As soon as Burns began recording, he stated:
 {¶ 11} "Okay and you know I've told you[,] you know you're not under arrest[,] your [sic] free to go at any time. You know we're here to talk to [you] about an incident."
 {¶ 12} Appellant stated that he understood the purpose of the interview and confirmed his awareness that he was not under arrest. During the taped statement, appellant provided a detailed account of his involvement in the episode in question. Appellant stated he was in the back seat of Bailey's car when they picked up Anderson. Appellant further noted that, when they arrived at Bailey's trailer, he immediately went into the backroom with Bailey where they conversed briefly. After several minutes, he re-entered the main room and saw Anderson on her hands and knees performing oral sex on Bailey. At that point, appellant admitted he took his shorts off and had sex with Anderson. Appellant emphasized that Anderson "didn't say no or stop or don't do that or anything."
 {¶ 13} On February 13, 2004, the Portage County Grand Jury indicted appellant on one count of rape, in violation of R.C.2907.02(A)(2)(B) and one count of complicity to kidnapping, in violation of R.C. 2923.03 and 2905.01(A)(4), both felonies of the first degree. Appellant entered a plea of not guilty and moved the court to suppress his statements for Burns's failure to provide him with Miranda warnings. Following the suppression hearing, the trial court overruled appellant's motion finding appellant made his statements in a non-custodial setting and his statements were made voluntarily.
 {¶ 14} The matter proceeded to a jury trial on September 20, 2004. The jury returned a verdict of guilty on both counts. On October 18, 2004, the trial court sentenced appellant to concurrent five year sentences on the convictions. Appellant now appeals and asserts the following assignments of error:
 {¶ 15} "[1.] The trial court erred by failing to suppress the appellant's custodial statements that were provided without the invocation of his Miranda protections.
 {¶ 16} "[2.] The verdicts are against the manifest weight of the evidence.
 {¶ 17} "[3.] The sentence imposed against the appellant, which involved sentencing enhancements not found by a jury, is unconstitutional under the holding of the United States Supreme Court in Blakley v. Washington (2004), 124 S.Ct. 2531."
 {¶ 18} In his first assignment of error, appellant argues the statement he provided to police should have been suppressed. When reviewing a trial court's ruling on a motion to suppress, we recognize the trier of fact is the arbiter of evidential weight and witness credibility. State v. Retherford (1994),93 Ohio App.3d 586, 592. Thus, we are bound to accept the trial court's factual determinations if they are supported by competent and credible evidence. State v. Molk, 11th Dist. No. 2001-L-146, 2002-Ohio-6926, at ¶ 9. Accepting those facts as true, we then independently determine, as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard. Id.
 {¶ 19} Appellant specifically argues Detective Burns obtained incriminating statements during a custodial interrogation without giving appellant his Miranda warnings. Appellant notes he was brought into the North Post, a police outpost, and questioned about his exploits the preceding evening by a detective. Although appellant was told he was not under arrest and was free to leave, this advisement occurred about forty-five minutes into the interview. Appellant was never Mirandized.
 {¶ 20} Miranda warnings exist "solely to counterbalance the coercive atmosphere created by in-custody interrogation." Statev. Schrock (Nov. 8, 1991), 11th Dist. No. 89-L-14-099, 1991 Ohio App. LEXIS 5361, at 7. In determining whether Miranda applies, we must observe whether the incriminating statements at issue were a result of a custodial interrogation. See, State v.Buchholz (1984), 11 Ohio St.3d 24, 26. The ultimate inquiry here is whether there was a formal arrest or a restraint of appellant's freedom of movement commensurate with that of a formal arrest. California v. Beheler (1983), 463 U.S. 1121,1125.
 {¶ 21} Miranda makes it clear that the Miranda warnings must be given whenever one's "freedom of action is curtailed in any significant way from being compelled to incriminate themselves." (Emphasis added.) Miranda v. Arizona (1966),384 U.S. 436, 467. If a suspect has been significantly deprived of his freedom, he is in custody and Miranda applies. If, on the other hand, there is a deprivation of freedom but it is insignificant, there is no custodial interrogation. The deprivation of freedom adequate to create a "custodial interrogation" situation need not be as great as an arrest but it must be more than general on-the-scene questioning. State v.Smith (Dec. 7, 1981), 8th Dist. No. 43490, 1981 Ohio App. LEXIS 13508, at 6, citing Orozco v. Texas (1969), 394 U.S. 324. "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated."Berkemer v. McCarty (1984), 468 U.S. 420, 437.
 {¶ 22} Here, appellant was not formally arrested; thus, we shall direct our attention to the nature of the restraint (if any) on appellant's freedom of movement. In analyzing this issue, we bear in mind "the only relevant inquiry is how the reasonable [person] in the suspect's position would have understood [his or her] situation." Berkemer, supra, at 442. Our inquiry, therefore, shall focus upon whether a reasonable person would have felt free to leave the interview which prompted appellant's admissions.
 {¶ 23} Appellant voluntarily came to the North Post in a truck driven by Ely. While Ely was in the building with Detective Burns, appellant remained in the truck. Ultimately, Burns returned to the truck to retrieve appellant; according to his testimony, Burns "went to the vehicle where appellant was and he cooperated with me. It wasn't like I had to make him come in, * * *." Burns accompanied appellant into the North Post and ushered him into a "big[,] open room" on the first floor of the North Post. Appellant primarily spoke with Detective Burns, who was in "plain clothes;" after the taping commenced, Detective Hurd joined the interview. At no time was appellant handcuffed or physically restrained and, according to Burns, "he was not under arrest. [Rather, Burns] wanted to talk to [appellant] just to get his story." Burns, however, acknowledged he did not advise appellant he was free to leave and not under arrest before he began the taped interview.
 {¶ 24} At the beginning of the taped statement, the following exchange occurred:
 {¶ 25} "Burns: Okay and you know I've told you [. . .] you know you're not under arrest[,] your [sic] free to go at any time. You know we're here to talk about an incident.
 {¶ 26} "[Appellant]: Ah-huh.
 {¶ 27} "Burns: Right?
 {¶ 28} "[Appellant]: Yeah.
 {¶ 29} "Burns: Okay and you understand that?
 {¶ 30} "[Appellant]: Yeah[,] I understand."
 {¶ 31} Appellant then provides a statement detailing the previous evening's activities. Appellant stated he, Ely, and Bailey went to a bar known as "Slim and Jimbo's" (sic) at approximately 12:30 a.m. where they remained until the establishment closed. While at the bar, appellant noticed Ely dancing with the victim; after the three men left, Ely called the victim and asked her if she wanted to come over to Bailey's home. According to appellant, the victim acceded on the condition that the men could take her to work in the morning. Appellant stated the three men drove to the victim's home and all four people returned to Bailey's house. According to appellant, Ely, Bailey, and the victim sat in the front seat of the vehicle and he remained in the back seat.
 {¶ 32} Once inside Bailey's home, Ely and the victim sat on the couch and began to kiss. Appellant and Bailey retreated to the kitchen and then to Bailey's bedroom where the two men talked. After approximately ten minutes, Bailey left the bedroom, but appellant remained. While in Bailey's bedroom, appellant drank a beer and was looking at some model cars and posters on Bailey's wall. According to appellant, Ely then came back to the bedroom and retrieved him. Appellant returned to the living room and observed the victim engaged in oral sex with Bailey. At that point, appellant stated he began "screwing around with [the victim]" and then had sex with her. Appellant maintained "she didn't say no or stop or don't do that or anything."
 {¶ 33} The facts, when viewed in their totality, indicate that appellant was not in custody when he made his statement. Appellant was in a large, open room which was more like a "town hall" rather than a police interrogation room. The environment was not one which could be characterized as "police dominated." Moreover, the interview lasted approximately one hour after which appellant left. While Burns did not advise appellant that he was not under arrest and was free to leave prior to the taped interview, we do not believe a reasonable person would have felt restrained such that they were unable to leave the interview. Once appellant assented to providing a taped statement, Burns overtly communicated appellant was not under arrest and was free to leave. Appellant stated he understood and provided a statement throughout which he maintained the encounter was essentially coincidental yet consensual. The record demonstrates the tenor of the taped interview was conversational in nature and revealed no pressure or coercion on behalf of the interviewer. In sum, a reasonable person would not have felt he was not at liberty to terminate the discussion and leave. Accordingly, Burns was not required to provide appellant with Miranda warnings.
 {¶ 34} Based on the foregoing, we conclude there is adequate record evidence to support the trial court's decision to overrule appellant's motion to suppress. The first assignment of error is without merit.
 {¶ 35} In his second assignment of error, appellant maintains his conviction was against the manifest weight of the evidence.
 {¶ 36} In State v. Thompkins (1997), 78 Ohio St.3d 380, the Supreme Court of Ohio stated:
 {¶ 37} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594." Id. at 387
 {¶ 38} In essence, a challenge to the weight of the evidence is a challenge to the probative force of the evidence supporting the conviction. Accordingly, when reviewing the weight of the evidence, an appellate court sits as a "thirteenth juror" and determines whether the state submitted adequate, credible evidence to sustain the conviction beyond a reasonable doubt. Id.
 {¶ 39} Under his second assignment of error, appellant attacks the credibility of the victim's testimony. Specifically, appellant sets forth various alleged inconsistencies and between Anderson's testimony at trial and other renditions of the events leading to her rape.
 {¶ 40} Initially, appellant argues that Anderson's testimony regarding the various sexual positions she was forced into was illogical. However, the fact that some of the bawdy particularities of the attack might seem "out of the ordinary" is inadequate to render Anderson's testimony objectively unbelievable. Further, appellant points out Anderson testified that her clothes were "ripped" from her body but the clothing showed no evidence of tearing or destruction. The jury heard the evidence and did not find it problematic. This alleged inconsistency does not weigh heavily against the conviction.
 {¶ 41} Appellant next contends that Anderson never informed law enforcement officers or hospital personnel of being repeatedly slapped by Bailey during the episode yet testified to being struck during appellant's trial. An omission, while relevant to witness credibility, is not an inconsistency. Defense counsel pointed out this omission on cross-examination. However, the jury found Anderson's testimony credible irrespective of this omission. The evidence of this omission does not render the verdict against the weight of the evidence.
 {¶ 42} Appellant further contends the only evidence that the sex was not consensual was Anderson's testimony. While this is accurate, the jury's decision to believe Anderson does not render the convictions against the weight of the evidence: The victim consistently stated she thought she was raped by only two individuals, Ely and Bailey. Anderson remained adamant that the only two individuals she observed throughout the entire encounter were Ely and Bailey. Anderson did not identify appellant as a party to the attack; in fact, Anderson stated that her first visual encounter with appellant was at his trial. Appellant, accordingly, was not identified by Anderson, but by one of his co-defendants. To wit, Bailey indicated that, in addition to himself, appellant and Ely were present during the attack when he spoke with police on December 21, 2003. Once the police learned this information, they contacted Ely for purposes of obtaining a statement from him. Ely coincidentally arrived at the North Post with appellant whereupon Detective Burns asked Ely and appellant to make a statement. During his statement, appellant himself voluntarily admitted to engaging in sexual intercourse with Anderson. While appellant insisted the intercourse was consensual, Anderson's testimony that she never knew appellant was in the house (let alone involved) fundamentally belies appellant's position.
 {¶ 43} In sum, appellant directs this court's attention to alleged inconsistencies and/or omissions regarding the nature and character of the attack. Appellant notes certain testimony which Anderson mentioned at earlier trials which she left out in the instant matter (and vice versa); appellant also discusses certain shifts in appellant's testimony regarding Ely's and Bailey's specific roles in the attack. Defense counsel did well to point out such omissions or alleged inconsistencies for the jury to consider. After considering the evidence, the jury determined the existence or non-existence of the evidence underscored during cross-examination of Anderson was insufficient to completely undermine Anderson's testimony. In our view, the victim offered a generally consistent version of the attack which the jury found credible. We will not reverse the verdict under such circumstances.
 {¶ 44} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and resolving conflicts in the evidence, we hold the jury did not clearly lose its way. Accordingly, the inconsistencies and/or omissions set forth by appellant do not create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Appellant's second assignment of error is therefore without merit.
 {¶ 45} In his final assignment of error, appellant argues the trial court violated the United States Supreme Court's pronouncement in Blakely v. Washington (2004), 124 S.Ct. 2531
when it sentenced him to concurrent five year sentences.
 {¶ 46} Here, appellant was convicted of one count of rape and one count of complicity to kidnapping, both felonies of the first degree. The available statutory sentencing range for a felony of the first degree is between three and ten years. Under Ohio's felony sentencing structure, unless a defendant has served a previous prison term, a trial court must impose the shortest prison term authorized for the offense unless it finds on the record that the minimum sentence will demean the seriousness of the offender's conduct or will not protect the public from future crime by the offender or others. R.C. 2929.14(B). Appellant had not previously served a prison term.
 {¶ 47} At the sentencing hearing, the trial court determined the minimum sentence would demean the seriousness of appellant's conduct. Accordingly, the court sentenced appellant to two concurrent five year terms of imprisonment.
 {¶ 48} In Blakely, the United States Supreme Court held a trial court may not extend a defendant's sentence beyond the statutory maximum when the facts supporting the enhanced sentence are neither admitted by the defendant nor found by the jury. The statutory maximum is "the maximum sentence a judge may imposesolely on the basis of the facts reflected in the jury verdictor admitted by the defendant." Id. at 2537. (Emphasis sic.)
 {¶ 49} In light of this, appellant contends the R.C.2929.14(B) exercise involves an impermissible judicial fact-finding exercise. That is, the court's finding which permitted the upward departure was neither admitted by appellant nor found by the jury. Therefore, appellant concludes R.C.2929.14(B) violates Blakely and consequently he was entitled to a minimum sentence on each count, i.e., three years.
 {¶ 50} We have previously entertained appellant's argument and rejected it. See, State v. Fiedler, 11th Dist. No. 2003-L-190, 2005-Ohio-3388, at ¶ 44; State v. Langlois, 11th Dist. No. 2003-A-0080, 2005-Ohio-2795, ¶ 35-39; see, also, Statev. Morales, 11th Dist. No. 2003-L-025, 2004-Ohio-7239, ¶ 83. Specifically, under Blakely, the Sixth Amendment right to a jury trial has no application as long as the trial judge imposes a sentence within the general range of terms permissible based upon the jury verdict. In this respect, R.C. 2929.14(B) factors are similar to "aggravating circumstances" because a trial court's explicit finding of one of the two factors in a given case only means that a longer term can be imposed within the pre-existing statutory range. Accordingly, the procedure under R.C. 2929.14(B) does not violate Blakely and appellant's third assignment of error is overruled.
 {¶ 51} For the foregoing reasons, appellant's three assignments of error are without merit and the jury verdict and sentence of the Portage County Court of Common Pleas is hereby affirmed.
Grendell, J., concurs.
O'Neill, J., dissents with Dissenting Opinion.
[1] At trial, the defense put forth a theory that Anderson concocted the story to avoid being fired for her tardiness. Prior to December 21, 2003, Anderson had been employed by Krispy Kreme as a doughnut packager for some three months. During this time, Anderson was tardy once and absent from work five times. Anderson had recently been given a written warning regarding her attendance which stated any further unexcused absences could result in her termination. The defense opined that Anderson needed the job and its benefits to care for her family, which included two adult children, two minor children, and two grandchildren.