[Cite as *State v. Epling*, 2023-Ohio-418.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2022 CA 00008 |
| | : | |
| GARY J. EPLING | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Licking County Court of Common Pleas, Case No. 2021 CR 70

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: February 13, 2023

APPEARANCES:

For Plaintiff-Appellee:

WILLIAM C. HAYES
LICKING COUNTY PROSECUTOR

ROBERT N. ABDALLA
20 S. Second St.
Newark, OH 43055

For Defendant-Appellant:

KIMBERLYN SECCURO
720 S. High St.
Columbus, OH 43206

*Delaney, J.*

{¶1} Defendant-Appellant Gary J. Epling appeals the January 13, 2022 conviction and sentence by the Licking County Court of Common Pleas. Plaintiff-Appellee is the State of Ohio.

### FACTS AND PROCEDURAL HISTORY

### Indictment

{¶2} On January 28, 2021, the Licking County Grand Jury indicted Defendant-Appellant Gary J. Epling on one count of Gross Sexual Imposition (as to J.B.), a felony of the fourth degree in violation of R.C. 2907.05(A)(1), and one count of Gross Sexual Imposition (as to K.G.), a felony in the fourth degree in violation of R.C. 2907.05(A)(1). Epling was arraigned on February 3, 2021, where he entered a plea of not guilty to the charges.

### Motion to Suppress

{¶3} Epling filed a motion to suppress all evidence resulting from Epling's June 11, 2020 interaction with the Licking County Sheriff's Department. The State filed a response on July 6, 2021. The trial court set the matter for a hearing on September 8, 2021. At the hearing, the State clarified the two issues presented in Epling's motion to suppress. The first issue was whether Epling was in custody for purposes of *Miranda* and the second issue was whether Epling's Stepmother, who called an attorney during Epling's interaction with the detectives from the Licking County Sheriff's Department, had any impact on the question of custody. (T. 4). Counsel for Epling agreed those were the two matters at issue in the motion to suppress. (T. 4).

**Evidence Presented at the Hearing**

{¶4} Deputy Wayne Moore testified he was assigned to the detective bureau of the Licking County Sheriff's Department on June 11, 2020. While a detective, he wore plain clothes and a police badge either around his neck or at his waist near his firearm. He drove an unmarked police vehicle. On June 11, 2020, Deputy Moore and Licking County Sheriff's Detective Adam Beach were investigating Epling and allegations of his sexual misconduct with two minors. The detectives reported to a residence located on Johnstown-Alexandria Road in Licking County to have a conversation with Epling. (T. 9). At the time of the interview, Epling was 21 years old. (T. 10). He had graduated high school, was working full time, and enrolled in college where he studied computer sciences. (T. 22).

{¶5} Deputy Moore recorded the detectives' conversation with Epling, which the State introduced as State's Exhibit No. 1 and was admitted without objection. (T. 8, 16). The recording was played for the trial court.

The Audio Recording

{¶6} In the recording, Epling greets the detectives at the front door, and they ask to speak with him out by their cars. Det. Moore testified that Epling was only wearing shorts when he came to the door. The detectives ask Epling if he would like to put on some flip flops or pants. Epling says no because he was going to go back to bed. A detective tells Epling that he does not have to speak with them. Epling interrupts the detectives to tell someone in the house that a person has arrived for them.

{¶7} Epling leaves the house and walks with the detectives outside. Det. Moore asks Epling if that is his mother, and a woman is heard greeting the detectives. The

detectives inform Epling's stepmother ("Stepmother") that her son's name came up during an investigation. She inquires further, but the detectives tell her that because Epling is an adult, they want to maintain his privacy and speak with him alone. Stepmother tells them she will be right inside the home.

{¶8} A detective tells Epling that they are investigating allegations from two women about sexual encounters that occurred some time ago. Epling responds that he knows exactly who they are talking about. Epling tells the detectives that it happened when he was in high school and he thinks it involved K.G., his stepsister's friend who spent the night at their house. Epling describes his memory of the incident where he tried to make a move on K.G. Epling then volunteers the name of the other girl, J.B. and describes their interaction when J.B. was in fifth or sixth grade and Epling was 15 or 16 years old.

{¶9} Stepmother interrupts and asks if Epling can put some pants on. The detectives respond that they asked Epling to put pants on. Stepmother responds that he was nervous, and he was going to put some pants on. No one speaks on the recording for a few seconds. Epling comes back on the audio, apologizing to the detectives for putting on pants. The detectives ask Epling if he is still comfortable because they don't want to make him feel uncomfortable. Epling says yes.

{¶10} The detectives then describe to Epling the women's allegations against him. Epling tells the detectives his recollection of the encounters. The detectives question Epling regarding the details of his encounters with the women. After Epling describes the encounters, one of the detectives tells Epling that they are just there to talk to him now. They don't want to later learn there are more allegations against him.

{¶11} A detective directs Epling to sit on the porch while the detectives speak, and then they would be back to speak with him. A detective asks if that is alright with Epling. Epling asks if he is supposed to sit on the porch. A detective responds that they are not holding him here, they just may have some follow-up questions. He says if Epling doesn't mind, they would appreciate it. Epling responds that he understands.

{¶12} The detectives return and tell Epling that they are going to file their report, that Epling was honest, and they will give the report to the prosecutors for their review. Stepmother asks the detectives whether she needs to get her son an attorney. She asks the detectives whether they are charging her son with something. The detectives respond that the prosecutor's office will make that decision, but they have probable cause to arrest Epling for gross sexual imposition.

### Epling's Stepmother

{¶13} Epling's Stepmother testified at the motion to suppress hearing that when the detectives arrived at the home, Epling asked her if he needed an attorney. (T. 26). Stepmother testified that she asked the detectives if Epling needed an attorney. The detectives told her no. (T. 19-20). While Epling was speaking with the detectives, she called her family attorney and spoke with him during Epling's interview. (T. 21). She stated the attorney told her to go outside, but the detectives told her no, she was not allowed out there. (T. 21).

### Trial Court Judgment

{¶14} While on the record, the trial court denied the motion to suppress. The trial court found that Epling was not in custody for *Miranda* purposes. At the time of the interview, the detectives were in plain clothes and there was no indication they were

armed. They interviewed Epling outside of his home. The first thing the detective said to Epling was that you don't have to talk with us, indicating that Epling was not required to speak with them. (T. 38). While Epling had no prior history with the criminal justice system, Epling was 21 years old and a high school graduate. (T. 39). Taking all circumstances into consideration, the trial court found that the interview on June 11, 2020 did not amount to custodial interrogation and therefore, the *Miranda* issue was not triggered. (T. 39).

{¶15} The trial court journalized its judgment on the record via judgment entry filed on September 8, 2021.

## Bench Trial

{¶16} Epling waived his right to a jury trial and elected to have the matter heard at a bench trial, held on November 16, 2021. The following evidence was adduced at trial.

## J.B.

{¶17} Count One charged Epling with gross sexual imposition based on a course of conduct involving the minor child, J.B., from August 1, 2014 through September 1, 2016. Epling was born in 1998. J.B. was born on July 27, 2002. She became friends with Epling's stepsister ("Stepsister") in fourth or fifth grade and she was on the softball team with Stepsister and K.G.

{¶18} J.B. testified that in the summer of 2014, she was 12 years old and going into the eighth grade. Epling was in high school and was 16 or 17 years old. In August 2014, she attended Stepmother's birthday party at Epling's home located on Johnstown-Alexandria Road. J.B. was sitting beside Epling on the couch in the basement living room, watching television. Two younger children were in the room playing on a computer. While he was sitting beside J.B., Epling laid his hand on J.B.'s upper thigh and began rubbing

her thigh. J.B. was wearing jeans with rips or holes in the upper thigh area. Epling slipped two of his fingers underneath the rip in her jeans and touched her skin. J.B. testified it felt like Epling touched her thigh for a few minutes. While Epling was touching her thigh, J.B. testified that she sat there nervously and fidgeted. She did not say anything to Epling. She believed that she nudged Epling's hand away while he touched her thigh, but he continued to rub her thigh and she stopped nudging his hand away. J.B. felt his hand under her jeans creep towards her genital area but Epling did not touch her genitals. While his hand was on her thigh, J.B. testified that Epling went underneath her shirt and touched her breasts. J.B. was wearing a bra at the time and could not recollect if Epling went underneath her bra to touch her skin. She remembered Epling's contact with her breasts lasted for a few minutes. J.B. did not say anything to Epling while he touched her, but she testified she felt nervous and scared because she was much tinier than him at five foot and two inches tall and weighing 105-110 pounds. Epling stopped touching J.B. when she moved away.

{¶19} J.B. testified a second incident occurred with Epling approximately one year later when J.B. was 13 years old and in eighth grade and Epling was approximately 17 years old and in high school. J.B. was at Epling's home for a sleepover with Stepsister and K.G. Stepsister and K.G. had gone to sleep, while J.B. stayed with Stepmother and Epling's father in the living room, watching a movie. Eventually Stepmother and Epling's father went to bed and Epling asked if J.B. wanted to come into his bedroom.

{¶20} J.B. went into his room and sat on the edge of his bed. Epling sat beside her on the edge of the bed. J.B. spoke to Epling about her struggles with self-harm and she pointed to an area on her leg where she had cut herself. Epling touched her leg where

she had pointed to her cuts. J.B. testified that she laid down on the bed, and then Epling came over her on the bed, hovering over her while laying fully on the bed. He was leaning on his right arm and he put his knee over her. He touched her stomach and breasts over her clothes. Epling then started rubbing his waist or pelvic area against J.B.'s pelvic area.

{¶21} J.B. and Epling did not say anything to each other while Epling touched J.B. J.B. felt she could not get away from Epling while he touched her because he was in the way and she could not get around him. J.B. did not resist Epling because she was scared and he was bigger than she was. After rubbing his waist or pelvic area against J.B., Epling stopped and stared at J.B. He then told J.B. to leave, which she did.

{¶22} J.B. did not speak to anyone about Epling's actions immediately after the two incidents. She testified that when she was in high school, she told K.G. about the incidents.

{¶23} Stepsister testified that J.B. told her she had a crush on Epling. J.B. denied having any romantic feelings for Epling.

{¶24} Epling testified on his own behalf. He stated he was 15 or 16 years old and J.B. was 12 or 13 years old at the time of the first incident. He testified that he believed J.B. wanted him to touch her because she told him that she had a crush on him. He agreed that he touched her breasts but he did not go underneath her jeans through the rip in the jeans; he only touched her skin over the rip in her jeans. He recollected that J.B. did not say anything while he touched her, but she did not push his hand away when he touched her. As to the second incident, he testified that he believed J.B. had a crush on him and she wanted him to touch her. J.B. voluntarily came into his room, laid on his bed, and asked him to cuddle with her. While they were laying on the bed, his groin area was

against her hip. They stopped cuddling when he told her he wanted to go to bed and J.B. left the room.

K.G.

{¶25} Count Two charged Epling with gross sexual imposition based on conduct on or about May 1, 2016 through September 30, 2016 with K.G. K.G. was born on April 25, 2003. She was friends with Stepsister because of school and the softball team, through which, her family became friends with Epling's family.

{¶26} In 2016, during the summer before she started eighth grade, K.G. was 13 years old, four foot and eleven inches tall, and 100 pounds. Epling was 17 years old and K.G. testified he was the size of a full-grown adult. K.G. was at a sleepover at Stepsister's home located on Johnstown-Alexandria Road. Epling was at the home with his friend, M.K. M.K. testified that earlier in the evening, he and Epling smoked marijuana. K.G. testified that Stepsister's bedroom was under construction, so the four teenagers chose to sleep in Epling's bedroom. Epling's bed was two bunkbeds pushed together. The four teenagers laid in Epling's bed together, where K.G. laid on her left side with her back to Epling. She was wearing a hoodie and leggings. K.G. testified that Stepsister and M.K. fell asleep while she was trying to fall asleep. She heard Epling say her name and then felt him shake her a little bit, but she did not respond because she wanted to fall asleep. She then felt Epling put his hand between her legs and move his hand towards her pubic area. She moved, hoping that Epling would remove his hand, which he did. She felt him return and remove his hand between her legs four times. K.G. stayed silent and did not tell him to stop. When she felt his hand touch her genital area, K.G. got up, grabbed Stepsister, and left the room. Stepsister and K.G. went to Stepsister's room, where K.G.

told Stepsister what happened with Epling. K.G. said Stepsister told her not to tell anyone what happened.

{¶27} K.G. did not tell anyone else what happened with Epling until April 2020, when her parents asked her. Stepmother contacted K.G.'s mother to tell her that K.G. was allegedly telling people that Epling was a rapist. K.G. denied saying that about Epling, but told her parents what happened to her with Epling. She did not say anything before because she was scared and wanted to forget about it.

{¶28} K.G. denied having any romantic interest in Epling. Stepsister testified that K.G. flirted with Epling. When she and K.G. were in bed with Epling, Stepsister said she heard K.G. giggling and laughing, and then they left the room. M.K. testified he was asleep and did not see anything happen between Epling and K.G. in bed.

{¶29} Epling's counsel introduced Defense Exhibit 1, a paper containing images of alleged texts between Epling and K.G. from June 3, 2016. One text stated, "when we get back we'll fuck." (T. 39). K.G. denied sending the texts in Defense Exhibit 1 to Epling. On redirect examination by the State, K.G. testified there were no phone numbers, account names, or profile names on Defense Exhibit 1. During Epling's testimony, Epling testified that Defense Exhibit 1 was a text exchange through the Kik app between him and K.G. on the date of the incident. He screenshotted the exchange because no one had texted him something like that before. Epling said K.G. texted him, "When we get back we'll fuck." Epling replied, "Promise." K.G. replied, "Yes, of course." Epling replied, "Today is going to be best date." K.G. replied, "Well tonight." Epling replied, "Oh, yeah, you're right." The last message said, "Better in the dark." (T. 166). Epling attempted to introduce his cell phone as evidence to show the screenshot on his phone, but the trial

court sustained the State's objection that Epling did not provide the cell phone in discovery. (T. 167). Epling did not move to have Defense Exhibit 1 admitted into evidence.

{¶30} Epling testified that he was under the impression that his conduct with K.G. was consensual. At the point where he felt like it was not consensual, he stopped touching her because he felt embarrassed.

<u>Deputy Moore</u>

{¶31} Deputy Wayne Moore of the Licking County Sheriff's Department testified as to his investigation with Det. Beach of the incidents. Det. Beach received information regarding the allegations by K.G. and J.B., which were provided to Deputy Moore. On June 11, 2020, Deputy Moore and Det. Beach interviewed Epling at his home, the audio of which was recorded by one of the officers. The audio recording, State's Exhibit A, was introduced and played at trial. Epling did not object to the admission of the exhibit. During the interview, the officer tells Epling they are investigating allegations of sexual misconduct and Epling tells the officers, "I know exactly what you are talking about." (T. 98). Epling named the alleged victims to the officers. He described what happened during the incidents, how he touched J.B. and K.G.

**Crim.R. 29 Motion and Verdict**

{¶32} At the end of the State's case, Epling moved to dismiss the charges pursuant to Crim.R. 29. The trial court denied the motion.

{¶33} The trial court entered its verdict, first finding Epling guilty on Count One of gross sexual imposition against J.B. In Count Two, the trial court found Epling guilty of the lesser included offense of sexual imposition against K.G., a third-degree

misdemeanor in violation of R.C. 2907.06(A)(1), because it did not find the State met the element of force under gross sexual imposition.

## Sentencing

{¶34} The trial court held the sentencing hearing on January 13, 2022. The trial court considered a presentence investigation report, the victim impact statements, the facts and circumstances, relevant seriousness, and recidivism factors.

{¶35} Via judgment of sentence filed on January 13, 2022, the trial court sentenced Epling to one year of community control and to register as a Tier I sex offender for the next 15 years.

{¶36} It is from this judgment entry that Epling now appeals.

## ASSIGNMENTS OF ERROR

{¶37} Epling raises five Assignments of Error:

{¶38} "I. EPLING'S STATEMENT TO DETECTIVES ON JUNE 11, 2020, SHOULD HAVE BEEN SUPPRESSED UNDER SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, BECAUSE EPLING WAS IN CUSTODY, INTERROGATED, AND MADE INVOLUNTARY STATEMENTS WITHOUT *MIRANDA* WARNINGS.

{¶39} "II. THE TRIAL COURT ERRED IN SUSTAINING THE STATE'S OBJECTION REGARDING DEFENSE EXHIBIT I BECAUSE DEFENSE AUTHENTICATED MESSAGES EPLING RECEIVED FROM K.G. WHICH ESTABLISHED THAT THE ENCOUNTER WAS CONSENSUAL.

{¶40} "III. A CRIMINAL DEFENDANT IS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL'S PERFORMANCE AT TRIAL IS OBJECTIVELY UNREASONABLE BY FAILING TO ADMIT A PIECE OF AUTHENTICATED EVIDENCE WHICH SUPPORTED EPLING'S DEFENSE THAT THE ENCOUNTER WITH K.G. WAS CONSENSUAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶41} "IV. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT EPLING'S RULE 29 MOTION FOR ACQUITTAL. 11/16/21 TR. AT 137.

{¶42} "V. THE TRIAL COURT ERRED IN ENTERING CONVICTIONS OF GROSS SEXUAL IMPOSITION AND SEXUAL IMPOSITION WHICH [ARE] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF EPLING'S RIGHT TO DUE PROCESS OF LAW, AS PROTECTED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

## ANALYSIS

### I. Motion to Suppress

{¶43} In his first Assignment of Error, Epling contends the trial court erred in denying his motion to suppress.

### Standard of Review

{¶44} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to

evaluate witness credibility. *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶45} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. *See State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *See Williams, supra*. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994).

{¶46} The two issues before the trial court at the suppression hearing were whether Epling was in custody for purposes of *Miranda* and whether Stepmother could

stop the detectives from speaking with Epling. (T. 4). In his appeal, Epling only raises the issue of custodial interrogation. The trial court concluded that Epling was not in custody or subject to a custodial interrogation such that *Miranda* warnings would be required.[1]

{¶47} The Fifth Amendment to the United States Constitution guarantees that "'[n]o person * * * shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall * * * have the Assistance of Counsel.'" (ellipses sic.) *Miranda v. Arizona*, 384 U.S. 436, 442, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The inherently coercive nature of custodial interrogation heightens the risk that a suspect will be denied the Fifth Amendment privilege not to be compelled to incriminate himself because custodial interrogation can "'undermine the individual's will to resist and * * * compel him to speak where he would not otherwise do so freely.'" (ellipsis sic.) *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011), quoting *Miranda* at 467; *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

## Custody under *Miranda*

{¶48} Pursuant to *Miranda*, therefore, statements stemming from custodial interrogations are admissible only after a showing that the procedural safeguards have been followed. "Custody" is when a defendant is taken into custody "or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Miranda* at 478. The relevant inquiry is whether a reasonable person under those

---

[1] In his appeal, Epling contends the trial court should have also granted the motion to suppress under the higher standard afforded by Section 10, Article I of the Ohio Constitution. A review of the lower court proceedings shows Epling did not raise this argument to the trial court and is thereby waived on appeal.

circumstances would have felt they were under arrest. *State v. Schlupp*, 5th Dist. Coshocton No.2012CA0007, 2012–Ohio–6072.

{¶49} The United States Supreme Court has explained:

As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v. California*, 511 U.S. 318, 322–323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Stansbury, supra, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant factors include the location of the questioning, *see Shatzer, supra*, at —— – ——, 130 S.Ct., at 1223–1226, its duration, *see Berkemer v. McCarty*, 468 U.S. 420, 437–438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, *see Mathiason, supra*, at 495, 97 S.Ct. 711; *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Stansbury, supra*, at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, *see New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and

the release of the interviewee at the end of the questioning, *see California v. Beheler*, 463 U.S. 1121, 1122–1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, *Berkemer, supra*, at 437, 104 S.Ct. 3138, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. "Our cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer*, 559 U.S., at ——, 130 S.Ct. at 1224.

*Howes v. Fields*, 565 U.S. 499, 508–09, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012). However, the test involves no consideration of the particular suspect's "actual mindset." *Yarborough v. California*, 541 U.S. 652, 667, 124 S.Ct. 2140, 158 L.Ed.2d 938 (1994). *Accord, State v. Mason*, 82 Ohio St.3d 144, 153, 1998-Ohio-370, 694 N.E.2d 932 (1998); *State v. Gumm*, 73 Ohio St.3d 413, 429, 1995 Ohio 24, 653 N.E.2d 253(1995).

{¶50} The United States Supreme Court has recognized custodial interrogation is not limited to a police stationhouse interrogation. *State v. Jacks*, 5th Dist. Muskingum No. CT2022-0013, 2022-Ohio-4374, 2022 WL 17489066, ¶ 22 citing *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381(1968) (questioning of defendant by an agent from the Internal Revenue Service while defendant was incarcerated); and *Orozco v.*

*Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311(1969) (questioning of defendant, by the police, in defendant's bedroom).

{¶51} However, police are not required to administer *Miranda* warnings to everyone whom they question. *Jacks, supra* at ¶ 23 citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977). "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id. Accord, State v. Biros*, 78 Ohio St.3d 426, 440, 1997-Ohio-204, 678 N.E.2d 891.

Interrogation under <em>Miranda</em>

{¶52} In *Rhode Island v. Innis*, the United States Supreme Court defined what is considered an "interrogation" for purposes of *Miranda*:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is

reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Jacks*, 2022-Ohio-4374, ¶ 24 quoting *Innis*, 446 U.S. 291, 300-302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted). The United State Supreme Court further noted, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. 302, 100 S.Ct. 1682, 64 L.Ed.2d 297, n.8.

{¶53} On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. Moreover, there is no requirement that officers interrupt a suspect in the course of making a volunteered statement to recite the *Miranda* warnings. *State v. Tucker*, 81 Ohio St.3d 431, 438, 1998-Ohio-438, 692 N.E.2d 171. In the context of obtaining a voluntary consent to search, the United States Supreme Court observed, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247(1984); *United States v. Drayton*, 536 U.S. 194, 205, 122

S.Ct. 2105, 153 L.Ed.2d 242 (2002). Therefore, it can be assumed that no Fifth Amendment violation occurs when the police ask an individual to speak with them without expressly informing the citizen of his or her right to say no. *Jacks, supra* at ¶ 25.

<u>No Custodial Interrogation for *Miranda* Purposes</u>

{¶54} On June 11, 2020, when the officers spoke with Epling at his home, he was 21 years old, a high school graduate, employed, and attending college. When the officers first made contact with Epling at the front door of his home, Epling was only wearing shorts. The officers clearly informed Epling that he did not have to speak with them. Epling interrupted the officers to speak to someone inside the home. Before asking any questions, the officers asked Epling if he would like to put on pants or flip flops, which Epling declined. They next asked Epling to come to their car to speak with them and the audio reflects Epling and the officers went outside the home to speak, but not near the officers' car. Det. Beach testified he was driving an unmarked police vehicle and the officers were wearing plain clothes, which Stepmother mentioned in the audio recording.

{¶55} Epling was within shouting distance of Stepmother, who was inside the home during the interview. Stepmother called from the home to ask if Epling could put on pants. The interview stopped while Epling put on pants. After he put on his pants, the officers ask Epling if he is comfortable, to which Epling affirmatively responds.

{¶56} After the interview, the detectives direct Epling to sit on the porch while they spoke. A detective asks if that is alright with Epling. Epling asks if he is supposed to sit on the porch. A detective responds that they were not holding him here, they just might have some follow-up questions. A detective says that if Epling doesn't mind, they would

appreciate it. Epling responds that he understood. The detectives returned to the porch and inform Epling and Stepmother that Epling was not under arrest.

{¶57} The trial court found Epling's June 11, 2020 interview with the detectives did not constitute a custodial interrogation. We consider the circumstances surrounding the interrogation where the detectives told Epling that he did not have to speak with them, Epling was interviewed outside his home, the detectives were wearing plain clothes and driving unmarked vehicles, Epling was not physically restrained while he was interviewed, the detectives permitted Stepmother to stop the interview so Epling could put on pants, and Epling was released at the end of the questioning. Under these circumstances, we find a reasonable person would have felt he was at liberty to terminate the interrogation and leave.

{¶58} Because Epling was not in custody, he was not entitled to *Miranda* warnings. The trial court properly denied the motion to suppress.

{¶59} Epling's first Assignment of Error is overruled.

## II. Introduction of Epling's Cell Phone into Evidence

{¶60} In his second Assignment of Error, Epling argues the trial court abused its discretion when it sustained the State's objection as to the introduction of Epling's cell phone during Epling's direct examination. We disagree.

{¶61} During the cross examination of K.G., counsel for Epling introduced Defense Exhibit 1, a paper showing images of alleged text messages between Epling and K.G. on June 3, 2016. (T. 38-39). K.G. denied sending Epling the text messages in Defense Exhibit 1. (T. 39). Epling testified as to Defense Exhibit 1 and read the alleged text messages during his testimony, stating K.G. sent him the text messages. (T. 165).

During Epling's testimony regarding Defense Exhibit 1, counsel attempted to introduce Epling's cell phone into evidence to demonstrate the text messages were between Epling and K.G. (T. 166). The State objected on the basis that Epling had not provided the cell phone in discovery. (T. 167). The trial court inquired whether Epling had an expert to do a forensic on the phone or asked the State to do a forensic on the phone. (T. 167). Epling's counsel responded that he had not. (T. 167). The trial court sustained the State's objection to the introduction of Epling's cell phone into evidence. (T. 167). Counsel for Epling did not move to admit Defense Exhibit 1 into the record.

{¶62} "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *State v. Romy*, 5th Dist. No. 2020 CA 00066, 2021-Ohio-501, 168 N.E.3d 86, 2021 WL 734758, ¶ 49 citing *Rigby v. Lake County*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). The appellate court must limit its review of the trial court's admission or exclusion of evidence to whether the trial court abused its discretion. *Id*. The abuse of discretion standard is more than an error of judgment; it implies the court ruled arbitrarily, unreasonably, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶63} The State did not object to the admission of Defense Exhibit 1. The State objected to the introduction of Epling's cell phone into evidence, which was not provided to the State in discovery prior to trial. The trial court is permitted to regulate discovery pursuant to Crim.R. 16, which includes the sanctions under Crim.R. 16(L)(1):

(L) Regulation of Discovery.

(1) The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶64} We find no abuse of discretion for the trial court to prohibit Epling from introducing the cell phone into evidence because the material was not disclosed in compliance with Crim.R. 16.

{¶65} Epling's second Assignment of Error is overruled.

### III. Admission of Defense Exhibit 1

{¶66} Epling argues in his third Assignment of Error that he received the ineffective assistance of counsel for trial counsel's failure to move to admit Defense Exhibit 1 into the record. We disagree.

{¶67} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶68} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id*. at 690.

{¶69} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

{¶70} Epling's trial counsel introduced Defense Exhibit 1 during K.G.'s testimony. She read the image of alleged texts between her and Epling and denied sending Epling the texts in the exhibit. (T. 39). During Epling's direct testimony, Epling read into the record the entirety of the text messages shown in Defense Exhibit 1. (T. 165). He testified that he exchanged the messages with K.G. and that he screenshotted them, having never received anything like that before. (T. 165). Trial counsel did not move to admit Defense Exhibit 1 into evidence.

{¶71} On appeal, Epling contends his trial counsel was deficient for his failure to move the trial court to admit the exhibit. He contends the exhibit was properly authenticated. Epling contends that if Defense Exhibit 1 had been admitted as evidence, it would have demonstrated the encounter between Epling and K.G. was consensual, thereby changing the outcome of the proceedings.

{¶72} Upon a review of the record, we find that Epling cannot meet the second *Strickland* prong and establish actual prejudice by trial counsel's failure to move the trial

court to admit Defense Exhibit 1 into evidence. K.G. testified that Defense Exhibit 1 was a printout of images of texts, but it did not contain any identifying information such as phone numbers, account names, or profile names. Epling read the entirety of the text messages listed in Defense Exhibit 1 into the record. He testified that K.G. sent him the messages and as to why he screenshotted the images of the text messages. The witnesses' testimony as to the contents of Defense Exhibit 1 was before the trial court to consider whether Epling engaged in gross sexual imposition with K.G. Upon the evidence presented, the trial court found Epling guilty of the lesser included offense of sexual imposition. Upon this record, we cannot say that Epling's trial counsel was deficient so that Epling suffered actual prejudice and the proceeding would have been different.

{¶73} Epling's third Assignment of Error is overruled.

## IV. Sufficiency of the Evidence

{¶74} In his fourth Assignment of Error, Epling contends the trial court erred when it denied his Crim.R. 29 motion for a judgment of acquittal.

## Standard of Review

{¶75} The appellate court reviews a denial of a Crim.R. 29 motion for acquittal using the same standard used to review a sufficiency of the evidence claim. *State v. Henderson*, 5th Dist. Richland No. 17CA104, 2019-Ohio-4958, ¶ 15 citing *State v. Larry*, 5th Dist. Holmes No. 15CA011, 2016–Ohio–829, ¶ 20 citing *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965, 1995–Ohio–104. An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61

Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

{¶76} Crim. R. 29(A) allows a trial court to enter a judgment of acquittal when the

state's evidence is insufficient to sustain a conviction. A trial court should not sustain a

Crim. R. 29 motion for acquittal unless, after viewing the evidence in a light most favorable

to the state, the court finds no rational finder of fact could find the essential elements of

the charge proven beyond a reasonable doubt. *State v. Franklin*, 5th Dist. Stark No. 2007-

CA-00022, 2007-Ohio-4649, 2007 WL 2596150 at ¶ 12, citing *State v. Dennis*, 79 Ohio

St.3d 421, 683 N.E.2d 1096.

### Gross Sexual Imposition

{¶77} As to J.B., the trial court found Epling guilty of gross sexual imposition, a

violation of R.C. 2907.05(A)(1), which states:

> (A) No person shall have sexual contact with another, not the spouse of the
>
> offender; cause another, not the spouse of the offender, to have sexual
>
> contact with the offender; or cause two or more other persons to have
>
> sexual contact when any of the following applies:
>
> (1) The offender purposely compels the other person, or one of the other
>
> persons, to submit by force or threat of force.
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years
>
> of age, whether or not the offender knows the age of that person.

Epling argues the State failed to prove the element of force necessary for a conviction of

gross sexual imposition.

{¶78} The term "force" is defined by R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2907.05(A)(1) requires the victim's submission to sexual contact to be obtained by force or threat of force. *State v. Biggs*, 2022-Ohio-2481, 192 N.E.3d 1306 (5th Dist.), ¶ 16. In *State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988), the Supreme Court of Ohio found the amount of force required to meet this requirement varies depending on the age of the victim and the relationship between the victim and the defendant. *Id.* at ¶ 58. However, some amount of force must be proven beyond the force inherent in the crime itself. *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N.E.2d 763, 766 (1998).

{¶79} The instant case involves a child victim, who was not asleep. J.B. testified that at the time of the first incident of sexual contact with Epling, she was 12 years old. Epling was 16 or 17 years old. Epling corroborated J.B.'s age in the audio recording of his interview with the detectives. During the second incident, J.B. testified she was 13 years old and Epling was 17 years old. J.B. was friends with Epling's younger stepsister and the sexual contact occurred when J.B. was at Epling's home upon the invitation of Stepsister. In both incidents of sexual contact, Epling was alone with J.B. Epling did not remove J.B.'s clothing or manipulate her clothing beyond putting his fingers through the rip of her pants and reaching under her shirt and possibly her bra to touch her breasts. Epling did not tell J.B. to do anything or refrain from doing anything; there was no testimony that he threatened her in any way if she failed to comply with his sexual contact.

{¶80} In the first incident, Epling sat next to J.B. on the couch while he touched her. J.B. testified she brushed Epling's hand away from her, but he returned his hand and

kept touching her. J.B. testified that she was afraid of Epling because he was bigger than her. The sexual contact stopped when she moved away. In the second incident, Epling hovered over J.B. while she was laying down in his bed, put his knee over her, and ground his lower body against J.B.'s pelvis area, "dry humping" her. J.B. testified that she felt she could not get away from Epling because he was bigger than her and he was in her way. The sexual contact with Epling stopped when he stopped it. J.B. was able to leave without interference from Epling.

{¶81} The amount of force required to meet the requirement under R.C. 2907.05(A)(1) varies depending on the age of the victim. In this case, J.B. was 12 and 13 years old and in middle school while Epling was 16 or 17 years old and in high school. The determination of force also requires that some amount of force must be proven beyond that force inherent in the crime itself. During the second incident, J.B. testified she was laying on Epling's bed, he put his knee over her, and he leaned his larger body over her smaller body. He then ground his lower body into her pelvic or waist area in the act of dry humping her. J.B. testified that he was bigger than her and she could not get away from him or around him. It was only when Epling stopped grinding his body against her and leaning over her that J.B. was able to leave the room. We find these acts to be legally sufficient evidence of force to meet the elements in R.C. 2907.05(A) as to J.B. We note that the trial court, in considering the evidence, found the State failed to present evidence to support the element of "force" as to the charge of gross sexual imposition with K.G.

**Sexual Imposition**

{¶82} Epling next contends the evidence was insufficient to sustain a conviction for sexual imposition as to Epling's sexual contact with K.G. R.C. 2907.06(A)(1) states:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.

{¶83} In his appellate brief, Epling links his argument as to the lack of force when arguing there was insufficient evidence to support a conviction for sexual imposition. Force is not an element of sexual imposition. The relevant element is whether the offender knows that the sexual contact is offensive to the other person, or is reckless in that regard. Upon a review of the record, we find there was sufficient evidence to find that Epling knew his sexual contact was offensive to K.G. K.G. denied having any romantic feelings towards Epling or consenting to sexual contact with Epling. She denied sending Epling the text messages in Defense Exhibit 1. During the incident of sexual contact, K.G. testified that Epling shook her to see if she was awake and K.G. pretended to be asleep. Epling reached between her legs and slowly crawled his hand up her thigh. K.G. testified she would move and pull away so Epling would remove his hand, which he did. But then he returned his hand four more times, crawling up her thigh, until he reached her vaginal area. Epling's audio recording corroborated the sexual contact by Epling. K.G. testified the contact ended when she got up and left the bed, taking Stepsister with her. Epling

testified he stopped the contact when he felt it was not consensual and he was embarrassed.

{¶84} Epling's fourth Assignment of Error is overruled.

### V. Manifest Weight of the Evidence

{¶85} Epling contends in his final Assignment of Error that his convictions for gross sexual imposition and sexual imposition were against the manifest weight of the evidence. We disagree.

{¶86} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶87} In this case, there was no dispute that sexual contact between Epling and the two women occurred. Epling admitted to and corroborated the women's description of the sexual contact in the audio recording and during his testimony. The issues in this case are consent and force.

{¶88} Both women denied having any romantic interest in Epling or telling him they had romantic interest in him. K.G. denied sending him the text messages requesting sexual contact read by Epling from Defense Exhibit 1. When the incidents of sexual contact occurred, J.B. and K.G. both testified they happened to be at Epling's home because of their friendship with Stepsister, not a relationship with Epling. Epling, on the other hand, testified that he believed J.B. and K.G. were romantically interested in him and that is why he initiated the sexual contact; further, K.G. had sent him the text messages, which were so shocking to him that he screenshotted them. Stepsister testified that she believed both women were romantically interested in Epling.

{¶89} J.B. testified that she did not consent to the sexual contact by Epling. In both incidents, she testified that she remained silent and still because she was afraid. She could not physically move away from Epling during the second incident because he was leaning over her while she was laying down, he had his knee over her, and he was grinding his larger body against her smaller body. She testified that she could not leave until Epling stopped the sexual contact and moved himself off her body. Epling testified there was evidence of consent and no evidence force because J.B. voluntarily came into his bedroom and sat next to him on the couch, he stopped the sexual contact both times, and he let J.B. leave without incident.

{¶90} K.G. testified that she was pretending to be asleep when Epling reached between her legs and crawled his hand up her thighs, eventually touching her vaginal area. She said she pulled away and moved, while pretending to be asleep, to stop the contact. Epling did stop when she moved, but he touched her again. The touching did not stop until K.G. left the room. Epling testified he believed the sexual contact was

consensual because of the text messages. He stopped touching K.G. when he felt the contact was not consensual and he was embarrassed, letting her leave the room without incident.

{¶91} The cases essentially came down to a credibility determination between the State's witnesses and Epling's witnesses. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trial court, as the trier of fact in this case, was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Frye*, 5th Dist. Richland No. 17CA5, 2017-Ohio-7733, 2017 WL 4176953, ¶ 47 quoting *State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015-Ohio-3113, 41 N.E.3d 104, ¶ 61, citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). The finder of fact need not believe all of a witnesses' testimony but may accept only portions of it as true. *Id.*

{¶92} In this case, the trial court found that sexual contact occurred and as to J.B., Epling purposely compelled J.B. to submit by force or threat of force. As to K.G., the trial court found the State did not establish the element of force and found Epling was guilty of the lesser included offense, sexual imposition. Upon this record and the witnesses' testimony, we cannot find there is a manifest miscarriage of justice so that this conviction must be overturned.

{¶93} Epling's fifth Assignment of Error is overruled.

## CONCLUSION

{¶94} The judgment of the Licking County Court of Common Pleas is affirmed.

By: Delaney, J.,

Hoffman, P.J. and

Wise, John, J., concur.